# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| **DARRYL MITCHELL,** | * | **CASE NO. 1:20-cv-00363-DRC** |
| | * | **(Judge Douglas R. Cole)** |
| **Plaintiff,** | * | **(Magistrate Judge Karen Litkovitz)** |
| | * | |
| **vs.** | * | |
| | * | |
| **FUJITEC AMERICA, INC., et al.,** | * | **PLAINTIFF'S FIRST AMENDED** |
| | * | **VERIFIED COMPLAINT (WITH JURY** |
| **Defendants.** | * | **DEMAND ENDORSED HEREON)** |

_____

Now comes Plaintiff, Darryl Mitchell, by and through counsel, and for his First Amended

Verified Complaint against Defendants Fujitec America, Inc., Fujitec Co., Ltd., Gary Krupp,

Shawnez McKenzie, John Does 1-10, and Jane Does 1-10 (all of whom are collectively referred

to hereinafter as "Defendants"), hereby states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and

1343(a)(4) because Plaintiff's claims arise under federal statutes and involve civil rights,

specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, as amended. To the

extent there are associated claims based on state law, this Court may exercise its pendent

jurisdiction to hear such claims.

2.      Venue lies in this judicial district under 28 U.S.C. § 1391(b) and S.D. Ohio Civ.

R. 82.1 because:

   a.   the events, acts, or omissions that give rise to the Plaintiff's claims occurred in

        this district; and

   b.   Defendants reside in and/or have a principal place of business in this district.

3.      Plaintiff Darryl Mitchell ("Plaintiff") is an individual who is a resident of Warren County, Ohio.

4.      Plaintiff avers, upon information and belief, that Fujitec America, Inc. ("Fujitec" or "Company") is a corporation incorporated under the laws of Delaware, and licensed to transact business in Ohio, with its principal place of business in Warren County, Ohio.

5.      Plaintiff avers, upon information and belief, that Fujitec Co., Ltd. is the parent company of Fujitec America, Inc. and is a business established in Japan, but does business in the United States of America.

6.      Plaintiff avers, upon information and belief, that Fujitec Co., Ltd., through its President and CEO, Takakazu Uchiyama, was present at Fujitec's corporate meetings in the United States of America, and actively engaged in the operations of Fujitec, thereby availing itself of the laws and jurisdiction of the United States of America, including this judicial district.

7.      Plaintiff avers, upon information and belief, that Fujitec Co., Ltd. and Fujitec, as parent and wholly owned subsidiary, are members of the same collective entity and constitute a single business enterprise.

8.      Plaintiff avers, upon information and belief, that Fujitec Co., Ltd. operates and exerts control over Fujitec.  Plaintiff further avers that Fujitec Co., Ltd. controls the business and employment decisions of Fujitec, and that at all times relevant hereto, acted as the principal of Fujitec.

9.      Plaintiff avers, upon information and belief, that at all times relevant hereto, Fujitec acted as the agent of Fujitec Co., Ltd.

10.      Plaintiff avers, upon information and belief, that Defendant Gary Krupp ("Krupp") is an individual who is a resident of Atlanta, Georgia.

2

11.     Plaintiff avers, upon information and belief, that Defendant Shawnez McKenzie ("McKenzie") is an individual who is a resident of Butler County, Ohio.

12.     Plaintiff avers, upon information and belief, that Krupp, McKenzie, John Does, and Jane Does defendants are employees, shareholders, directors, agents, servants, dual agents and/or loaned servants of Fujitec and/or Fujitec Co., Ltd. under the doctrines of respondeat superior, agency, dual agency, and other legal principles.

## FACTUAL BACKGROUND

13.     Plaintiff incorporates herein by reference paragraphs 1-12 of the First Amended Verified Complaint and further avers as follows:

14.     Plaintiff is an attorney, duly licensed to practice law in the State of Ohio.

15.     On November 22, 2012, Plaintiff became employed with Fujitec as General Counsel, and was promoted to Chief Legal Officer in 2013.

16.     At all relevant times during his employment, Plaintiff had a sterling work reputation and personnel file.

17.     As Chief Legal Officer for Fujitec, Plaintiff served as Corporate Secretary, and managed the HR, Legal and Safety Departments.  As Chief Legal Officer, Plaintiff had an array of responsibilities, involving multiple departments, which included, but were not limited to: (1) oversight of new-hire onboarding; (2) the responsibility to review and approve raises and promotions, as well as decreases to salary and demotions; (3) review of matters related to employee discipline; and (4) managed all Company litigation.  Plaintiff also had national responsibilities that touched every department in the organization and fiduciary responsibility, along with personal liability for managing the Company's 401k plan.

18.     With respect to the Company's organizational hierarchy of employees, the Chief Legal Officer was at the same level as the other Officers of the company, including the Chief Executive Officer and Chief Financial Officer.

19.     As Chief Legal Officer, Plaintiff was similarly-situated with the other Officer-level employees, including the Chief Executive Officer and Chief Financial Officer, as well as Senior/Executive Vice President-level employees.

20.     In 2019, as Chief Legal Officer, Plaintiff was similarly-situated with Gary Krupp, the Chief Executive Officer, who is a Caucasian male (from time to time hereinafter referred to as a "Comparator").

21.     In 2019, as Chief Legal Officer, Plaintiff was similarly-situated with Joseph A. Smith ("Smith"), the Executive Vice President, who is a Caucasian male (from time to time hereinafter referred to as a "Comparator").

22.     In 2019, the position of Chief Financial Officer was vacant.

23.     In 2019, Plaintiff, an African American male, became aware of similarly-situated Caucasian employees receiving greater compensation than he was receiving.

24.     In particular, Plaintiff became aware that Krupp and Smith received significant salary increases, while Plaintiff did not.

25.     In 2019, Krupp's salary increased from $300,000 to $330,000, which represented a 10% increase from his previous salary.

26.     In 2019, Smith's salary increased from $250,000 to $300,000, which represented a 20% increase.

27.     Despite the rather significant increase in salary by the similarly-situated Caucasian employees (i.e., Krupp and Smith), Plaintiff received only a minimal raise leaving his

4

salary approximately 30% below the top-tier level of employees who were similarly-situated to him (i.e., the Comparators).

28.     In 2019, Plaintiff's salary was $235,000.

29.     In addition to the two similarly-situated employees having received significant pay increases, another Caucasian employee, Joe Rennenkamp, a non-senior Vice President employee earned a salary of roughly $235,000 in 2019.

30.     Thus, Plaintiff's salary at $235,000 was the equivalent of a non-senior Vice President employee's salary, despite the fact Plaintiff was an Officer-level employee, and despite the fact Plaintiff's job responsibilities as the Chief Legal Officer significantly exceeded Rennenkamp's job responsibilities as a non-senior Vice President.

31.     Additionally, Plaintiff's job responsibilities exceeded those of Smith, who earned $65,000 more than Plaintiff following Smith's salary increase.

32.     Given the organizational hierarchy of the company, as well as the job responsibilities commensurate with each position, Plaintiff's salary should have exceeded both Smith's salary and Rennenkamp's salary.

33.     Fujitec had the financial means to provide Plaintiff a salary increase in 2019 consistent with the increases it provided to similarly-situated Caucasian employees.  Many other employees received pay increases and promotions in 2019 including, but not limited to: Louis Antonello, a Caucasian employee (who was promoted from operations manager to branch manager); and Nick Bertucci, a Caucasian employee (who was promoted and received two pay increases in less than 18 months).

34.     Upon information and belief, Plaintiff avers that despite the fact that the Company was more than financially capable of equalizing Plaintiff's pay consistent with the Comparators

in 2019, and despite the fact that similarly-situated employees received significant pay increases in 2019, Plaintiff's request for equitable payment was denied due to his race.

35.     Upon information and belief, the Company has discriminated against other African American employees by paying such employees lower salaries than similarly-situated Caucasian employees.

36.     In 2019, Plaintiff became aware that Krupp's administrative assistant, Sherry Tabor, a Caucasian employee, received a salary of approximately $100,000, following a pay increase of 100% from a $50,000 salary in 2018.  Meanwhile, the National Safety Manager at Fujitec, an African American employee who has been employed with the Company for no less than 17 years, was being paid a salary of $98,000 per year.  Therefore, Tabor, a Caucasian administrative assistant, was paid more than the African American National Safety Manager who had national responsibilities.  Plaintiff further avers, upon information and belief, that the National Safety Manager has never been promoted despite multiple requests.

37.     Given the disparity between the salaries of Caucasian and African American employees and, given the significant salary increases provided to Krupp and Smith, Plaintiff sought to correct the injustice in this pay inequity.

38.     Plaintiff requested an increase in pay commensurate with his skills, duties and responsibilities at Fujitec, and as a matter of equity.

39.     Specifically, near the end of 2019, Plaintiff approached Defendant Krupp, who had become Chief Executive Officer of Fujitec, effective January 1, 2019, to engage in a discussion concerning Plaintiff's compensation and the inequities relating thereto.

40.     In his discussion with Krupp about receiving increased compensation commensurate with his job duties, skills, and responsibilities, and pay equity relative to

6

similarly-situated Caucasian counterparts, Plaintiff also presented his cost-saving and risk management efforts over the previous several years to demonstrate his value to the Company, specifically the savings Plaintiff generated for Fujitec.

41. However, Krupp refused to have any meaningful discussion and rejected Plaintiff's request for an equitable increase in compensation, despite the fact similarly-situated Caucasian employees had received salary increases, placing their compensation at a level significantly greater than that of the Plaintiff.

42. Additionally, at this time, Plaintiff discovered that Krupp had authorized certain organizational changes to the Company and approved certain pay raises. Traditionally, as Chief Legal Officer, Plaintiff was responsible for giving the final approval on organizational changes and pay raises within the Company. However, Krupp concealed certain organizational changes and pay raises from Plaintiff, including the 20% salary increase provided to Smith (i.e., a Comparator). Additionally, Plaintiff learned that Krupp had begun withholding from Plaintiff corporate information which Plaintiff historically had received and without which he would be unable to fully perform his job duties and responsibilities as Chief Legal Officer.

43. Krupp made these changes without Plaintiff's knowledge or approval, and in violation of Company policy, all to the detriment of Plaintiff.

44. Starting in 2013, and each year of Plaintiff's employment thereafter, up to and including 2019, Plaintiff received a bonus of 17.5% of his annual compensation for the preceding year, as agreed by Plaintiff and the Company. However, in 2020, and following Plaintiff's request for an equitable increase in his compensation, Plaintiff was denied the agreed-upon bonus for calendar year 2019.

45.     Also, starting in 2013, and each year of Plaintiff's employment thereafter, up to and including 2019, Plaintiff received a pay increase of approximately 5% of his then annual compensation, although his base compensation was not equivalent to that of similarly-situated high-level executives of Fujitec.  However, and contrary to the Company's past practices, and Plaintiff's expectations, Plaintiff was not given the usual and customary 5% pay increase for calendar year 2020.

### Fujitec's Purported Investigation of Plaintiff

46.     Shortly after denying Plaintiff's request for an equitable increase in his compensation, and denying Plaintiff the bonus and pay increase that Plaintiff had historically received each year from 2013-2019, inclusive, on January 14, 2020, Krupp asked Plaintiff to come to Krupp's office at Fujitec in Mason, Ohio and, upon Plaintiff's arrival, Krupp told Plaintiff that a complaint had been filed against him by Defendant McKenzie, an employee in Fujitec's Finance Department.  At no point prior thereto was Plaintiff the recipient of employee discipline, any negative allegations, or otherwise alleged to be in violation of any workplace policies.

47.     Fujitec's Controller, Daiji Yoshimura ("Yoshimura"), was also present for the meeting with Plaintiff in Krupp's office on January 14, 2020.  When Plaintiff inquired as to the nature of the complaint against him, Plaintiff was not provided any details.  Krupp merely stated that he "didn't want to get involved."  The meeting between Plaintiff, Krupp, and Yoshimura was short and lasted approximately five minutes.

48.     Immediately after the meeting was concluded, Krupp instructed Plaintiff to go to a conference room at Fujitec's Mason, Ohio facility, where he was interviewed by outside legal counsel for Fujitec, Betsy Bulat Turner ("Turner"), an attorney based in Atlanta, Georgia.

Plaintiff avers, upon information and belief, that prior to the purported investigation of Plaintiff in 2020, Turner had been consulted by Krupp for multiple legal matters without Plaintiff's knowledge and was referred to by other employees as "Gary's girl".

49.    At all relevant times, Fujitec had in place a policy that was adopted and enforced by Fujitec to manage and control the process for investigations and appeals concerning employee allegations of sexual harassment (the "Policy"). Pursuant to the Policy, Fujitec is required to thoroughly investigate allegations of sexual harassment and to "keep[] both parties informed as to the status of the investigation." The Policy also requires Fujitec to maintain the confidentiality of an investigation involving allegations of sexual harassment.

50.    During Turner's interview of Plaintiff, which lasted approximately fifteen minutes, Plaintiff inquired into the factual basis of McKenzie's complaint, and was told by Turner that McKenzie had made allegations of sexual harassment against Plaintiff for "propositioning" her. Specifically, Turner indicated that McKenzie alleged that, at some time between 2015 and 2017, Plaintiff had grabbed her by the waist in the breakroom/kitchen at work. He was provided no additional details.

51.    Plaintiff denied the allegations as no such thing ever happened and, therefore, McKenzie's allegations were false and were made with malicious intent.

52.    During the interview, Turner asked Plaintiff whether he had been to McKenzie's house and whether he had requested to visit her house between 2015 and 2017. Plaintiff denied ever having visited McKenzie's house and indicated that the only time a discussion was had about McKenzie's home was solely in the context of renovation projects to a recently purchased home wherein, in response to McKenzie's request for referrals, Plaintiff offered to provide her contact information of the contractors he used for his rental properties.

9

53.     Turner also asked whether Plaintiff participated in a ten-minute phone call with McKenzie in March, 2019.

54.     Plaintiff was not provided information as to the source of the purported phone record, its authenticity, and from whose account it allegedly came; nor was he given any information about the alleged content of such call.

55.     Consequently, given the absence of any details and the substantial length of time between the alleged phone call and the January 14, 2020 interview (nearly ten months), Plaintiff could only speculate as to whether such a call occurred, let alone what the contents of such a call may have been *if* it in fact occurred.

56.     On January 15, 2020, Plaintiff was placed on paid administrative leave by Krupp. Krupp delivered this distressful news in the form of a text message, telling Plaintiff he must immediately leave the premises.

57.     On January 16, 2020, without any prior notice, Plaintiff was denied access to the Company's computers and telecommunication system, which included his Company email.  At no time was Plaintiff informed that the Company would take such measures against him while he was on paid administrative leave.  This is especially significant because up until the time his access was denied, Plaintiff was still receiving and responding to, in the ordinary course, business matters and concerns from Company employees and third party business entities.

58.     On January 17, 2020, Plaintiff sent Krupp a text message requesting an update with respect to the status of the McKenzie matter under review.  Plaintiff received no response from Krupp or anyone else affiliated with Fujitec.

10

59.     On January 19, 2020, Plaintiff sent a second text message asking Krupp for a status update concerning the review process; however, Krupp again failed to respond to Plaintiff's request for a status update.

60.     On January 21, 2020, Plaintiff made his third request to Krupp for a status update with respect to the review process.  For the third time, Krupp ignored this reasonable request and did not provide a response.

61.     On January 21, 2020, Plaintiff learned from a co-worker that Krupp divulged to non-authorized individuals sensitive information surrounding McKenzie's allegations against Plaintiff and the inquiry relating thereto, all in direct contravention of the Company's confidentiality policy.  Specifically, Plaintiff was advised that Krupp discussed the details of McKenzie's allegations and the Company's inquiry with several Fujitec employees during a social gathering where dinner and drinks were served.  Plaintiff avers, upon information and belief, that other than Krupp, none of the other persons present at the dinner party had a need to know about either the McKenzie allegations or the manner in which they were being handled by the Company.

62.     On January 28, 2020, Plaintiff made a fourth request to Krupp for a status update with respect to the McKenzie allegations against Plaintiff.  However, consistent with his conduct relating to the three previous requests, Krupp did not provide Plaintiff with any update on the review process.

63.     On January 31, 2020, Plaintiff left a voicemail message for Krupp requesting for the fifth time a status update regarding the review process.  Again, Krupp did not respond.

64.     On February 3, 2020, nearly three weeks after Plaintiff's initial (and only) interactions with Fujitec about the McKenzie allegations against him, Plaintiff finally received a

11

text message from Krupp advising him to come into the Mason, Ohio office on February 5, 2020 for the purpose of adding new anti-virus software to Plaintiff's laptop.

65.     Plaintiff responded, asking whether Krupp's text meant that Plaintiff would be returning to work from his paid leave.  However, and consistent with his "radio silence" while Plaintiff was on leave, Krupp did not respond to Plaintiff's question.

### Fujitec's Termination of Plaintiff

66.     On February 5, 2020, after discovering his employee badge no longer granted him access to the Fujitec building in Mason, Ohio, Plaintiff – upon being given access by Krupp – was escorted by Krupp to a conference room, wherein Krupp told Plaintiff that "we investigated you" and summarily stated, with no further details or explanation, that Plaintiff had violated the company's sexual harassment policy and that Plaintiff's termination was effective immediately.

67.     Despite the Policy's mandate for a thorough investigation, the process engaged in by Fujitec and Krupp was not thorough at all, given that Plaintiff was interviewed for a mere 15 minutes and the only information Plaintiff was provided concerning the allegations against him consisted of McKenzie's unfounded accusations which could not have been corroborated, because they simply were not true.

68.     Plaintiff avers, upon information and belief, that had there been a real and meaningful investigation and it had been conducted thoroughly, it would have revealed the falsity of McKenzie's allegations, as well as her malicious motives for making them.

69.     Specifically, Plaintiff avers that a truly thorough investigation would have revealed the following facts:

    a.   McKenzie was well aware of the fact that Plaintiff, in his capacity as Chief Legal Officer for Fujitec, oversaw and conducted investigations of employee allegations of workplace misconduct.

    b.   McKenzie was also well aware of the Company's anti-retaliation policy for reporters of workplace misconduct.

    c.   In late 2019, and prior to McKenzie's false allegations of misconduct by Plaintiff, Yoshimura informed Plaintiff of Fujitec's intention to terminate McKenzie, as well as another employee, Heidi Jones ("Jones"), for poor job performance. Plaintiff avers, upon information and belief, that Jones was McKenzie's best friend at Fujitec.  In making the determination to terminate McKenzie and Jones, Yoshimura expressed concern that McKenzie, given her opportunistic character, would file a lawsuit against Fujitec, and decided to defer taking action against Jones and McKenzie until January of 2020.

    d.   Plaintiff avers, upon information and belief, that Jones and McKenzie both became aware of Yoshimura's intent to terminate their employment with Fujitec.

    e.   After learning about her likely employment termination, Jones resigned in January 2020 before she could be terminated.

    f.   Jones' resignation left McKenzie alone in the office and in fear of losing her job.

70.    Plaintiff avers that a thorough and complete investigation would have led to a finding that McKenzie asserted a false charge against Plaintiff to shield herself from otherwise legitimate employment action, i.e., termination for poor job performance.  And, given her knowledge of Fujitec's anti-retaliation policy, she sought to protect her employment with the Company by falsely accusing Plaintiff.

13

71.     Plaintiff further avers that a thorough and complete investigation would have led to a finding that Plaintiff had a professional and purely platonic relationship with McKenzie.

72.     However, despite the Policy's requirement that Fujitec conduct a thorough investigation, the Company failed to do so.

73.     In addition, the Policy also required Fujitec to communicate the findings of the investigation to the individual investigated (i.e., Plaintiff), which Fujitec also failed to do.

74.     In the February 5, 2020 termination meeting, when Plaintiff inquired as to the factual basis underlying the outcome of the sexual harassment inquiry, Krupp refused to provide any details to Plaintiff in contravention of the Policy.  Instead, Krupp stated that the direction came from Japan, specifically Fujitec Co., Ltd., Fujitec's parent company, and that he was not to communicate with Plaintiff the status of the review into the McKenzie allegations against Plaintiff.  Similarly, when Plaintiff requested to see the evidence against him, Krupp rejected his request, and refused to provide Plaintiff with a copy of any written summary of findings for the same stated reason.

75.     Plaintiff avers, upon information and belief, that Fujitec Co., Ltd., as the parent company, shares a unity of interest with Fujitec, and at all relevant times hereto acted as Fujitec's principal and exerted control over Fujitec's employment decisions, and in such capacity was involved in the decision to terminate Plaintiff's employment with Fujitec, and violated Plaintiff's due process rights to a fair investigation regarding the allegations against him.  In this context, Fujitec Co., Ltd.'s conduct constituted acts of discrimination and retaliation against Plaintiff.

76.     Despite Fujitec's Policy to keep Plaintiff informed and communicate the findings of the investigation relating to the McKenzie allegations, Plaintiff was not provided any facts arising out of the purported investigation into McKenzie's allegations of sexual harassment.  He

14

was not provided the names of any alleged witnesses. And, he was neither shown nor given any documents, or any summaries or reports concerning the review process regarding McKenzie's false allegations, making any appeal of the termination decision perfunctory and the outcome preordained.

77.     Plaintiff avers that the refusal to provide Plaintiff with the information to which he was entitled was a deliberate measure taken by Fujitec and Fujitec Co., Ltd. to effectuate the termination which Fujitec had preordained at the direction and under the dominion and control of Fujitec Co., Ltd.

78.     After the Company failed to provide Plaintiff with any proof or evidence in support of the false sexual harassment allegations of McKenzie, when pressed for an explanation, Plaintiff was informed by Krupp that the **primary reason** for Plaintiff's termination was the alleged withholding of information from the Company concerning an incident involving Fujitec's former Chief Financial Officer, Ray Gibson ("Gibson"). Gibson's alleged misconduct occurred years prior, and Plaintiff's only knowledge of it arose out of rumors he heard from other Fujitec employees a year after Gibson had been removed from the Company.

79.     Until the February 5, 2020 termination meeting with Krupp, Plaintiff had no knowledge that Fujitec was alleging that he violated work rules relating to Gibson. Moreover, at no point during the inquiry concerning McKenzie's unfounded accusations was Plaintiff questioned/interviewed by Fujitec regarding any issue involving Gibson.

80.     Thus, Fujitec's stated primary reason for Plaintiff's termination had no relationship whatsoever to McKenzie's allegations against Plaintiff. Plaintiff avers, upon information and belief, that the Company could not provide Plaintiff with any evidence of the

truth of McKenzie's allegations to justify Plaintiff's termination and, therefore, changed the stated basis for his termination.

81.     Accordingly, Plaintiff was terminated following a review process which was tainted, conducted with bias, and was not thorough and, therefore, did not constitute a true investigation as required by the Company's written polices and its usual and customary practices and procedures.  Moreover, Plaintiff was never afforded the opportunity to be informed of the alleged evidence against him or to set the record straight and defend himself.

### Plaintiff's Appeal

82.     Pursuant to Fujitec's Policy, "[i]f either party directly involved in a sexual harassment investigation is dissatisfied with the outcome or resolution, that individual has the right to appeal the decision."

83.     Additionally, pursuant to the Policy, the appealing party has the right to have the appeal reviewed by an independent person, not previously involved in the underlying investigation.

84.     In addition to affording parties the right to appeal, the Policy also requires Fujitec to present the appealing party with "findings within 30 calendar days" after receiving the appeal.

85.     On February 18, 2020, and consistent with the Policy affording Plaintiff the right to appeal the results of the purported investigation, Plaintiff submitted an appeal on the basis that the alleged investigation of him was improperly and unfairly conducted and that Fujitec, Fujitec Co., Ltd., and Krupp violated the Policy when they: failed to conduct a thorough investigation; refused to communicate with Plaintiff with respect to the investigation's status and ultimate findings; and breached the confidentiality provision of the Policy by disclosing sensitive details

concerning the investigation of Plaintiff to other Fujitec employees who did not have a need to know and were not authorized to have access to such information.

86.     However, Fujitec neither considered Plaintiff's appeal, nor presented Plaintiff with any findings with respect thereto.

87.     Instead, on March 11, 2020, Plaintiff was advised that Fujitec and/or Fujitec Co., Ltd. "denied the appeal request" altogether.

88.     The denial of Plaintiff's appeal came in the form of a letter, dated March 11, 2020, from Krupp, an individual who was involved in the McKenzie matter, and a second letter, dated March 16, 2020, from Turner, another individual who was involved in the McKenzie matter.

89.     Thus, despite Fujitec's Policy affording its employees the right to appeal the results of an investigation and to have that appeal reviewed by an independent person, Fujitec, under the control of Fujitec Co., Ltd., chose not to permit Plaintiff's appeal to go forward at all.

90.     Given that Krupp and Turner (the two Company representatives who communicated the denial of Plaintiff's appeal and neither of whom indicated that an independent review had been conducted consistent with the Company's Policy) are the same individuals who conducted the purported investigation of Plaintiff arising out of McKenzie's sexual harassment allegations, the Defendants created the very conflict of interest the Policy was designed to protect against by requiring an independent party review.

91.     Based on the foregoing, Plaintiff's appeal rights under the Policy were violated.

92.     As a direct and proximate result of Defendants' treatment of Plaintiff before, during, and after his termination (i.e., Plaintiff being denied the appropriate salary increase commensurate with the increases received by other similarly-situated employees; Plaintiff having

17

his bonus taken away in retaliation for bringing pay inequity to his employer's attention; Plaintiff being denied his annual pay increase in retaliation for bringing pay inequity to his employer's attention; Plaintiff being wrongfully terminated and denied the appeal rights to which Plaintiff was entitled pursuant to the Company's Policy), Plaintiff has suffered significant emotional/mental distress and monetary damages.

## COUNT I
## Wrongful Termination

93.     Plaintiff incorporates herein by reference paragraphs 1-92 of the First Amended Verified Complaint and further avers as follows:

94.     In addition to the public policies prohibiting termination of an employee for being a member of a protected class pursuant to state and federal anti-discrimination laws and notifying an employer of disparate treatment at the workplace when compared with similarly-situated employees, there are clear public policies expressed in state and federal law which prohibit termination or other retaliation of an employee for reasons which include, but are not limited to:

    a.  Reporting illegal workplace conditions or transactions or otherwise exposing information or activity related thereto;

    b.  Reporting unlawful conduct committed by another employee and/or employer or otherwise exposing information or activity related thereto;

    c.  Reporting violations of company policy committed by another employee and/or employer or otherwise exposing information or activity related thereto;

    d.  Asserting an employee's constitutional rights;

    e.  Asserting an employee's rights under the company policy and/or reporting violations of the same;

18

     f.   Reporting workplace corruption or otherwise exposing information or activity related thereto; and

     g.   Reporting financial misconduct in the workplace, including but not limited to fraud, or otherwise exposing information or activity related thereto.

95.    Plaintiff's termination under the circumstances and facts set forth herein, i.e., where Plaintiff was terminated for reasons which include but are in no way limited to, reporting unlawful conduct of his employer and asserting his rights, jeopardize these clearly established public policies expressed in state and federal law.

96.    Plaintiff's termination under the circumstances and facts set forth herein was motivated by conduct related to and in violation of these clearly established public policies.

97.    Plaintiff was terminated in violation of state and federal laws and the public policies set forth therein, without any legitimate business justification.

98.    As a direct and proximate result of Defendants' intentional, illegal, and wrongful conduct, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

## COUNT II
### Defamation

99.    Plaintiff incorporates herein by reference paragraphs 1-98 of the First Amended Verified Complaint and further avers as follows:

100.    By falsely accusing Plaintiff of sexually harassing her, McKenzie published false and defamatory statements about Plaintiff without privilege to third parties and with the intent to harm Plaintiff in his character and reputation, and with fault of at least negligence, and said statements were defamatory per se.

101.    McKenzie published her false and defamatory statements about Plaintiff without privilege to third parties and with malice and hatred with the intent to harm Plaintiff in his character and reputation.

102.    Upon information and belief, by repeating McKenzie's false allegations to other Fujitec employees, Krupp published false and defamatory statements about Plaintiff without privilege to third parties and with the intent to harm Plaintiff in his character and reputation, and with fault of at least negligence, and said statements were defamatory per se.

103.    Krupp published such false and defamatory statements about Plaintiff without privilege to third parties and with malice and hatred with the intent to harm Plaintiff in his character and reputation.

104.    As a direct and proximate result of Defendants' intentional, illegal, and wrongful conduct, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

## COUNT III
### Invasion of Privacy by Publication of Private Facts (Krupp)

105.    Plaintiff incorporates herein by reference paragraphs 1-104 of the First Amended Verified Complaint and further avers as follows:

106.    In addition to publicly repeating the defamatory statements made by McKenzie, Krupp publicly disclosed facts concerning the private life of Plaintiff when, upon information and belief, he divulged to a large group of people, at a social gathering, extremely sensitive factual details about Plaintiff, including McKenzie's allegations against Plaintiff, as well as information related to the purported investigation concerning the same.

107.    In particular, Krupp disclosed the fact that Plaintiff had been accused (by McKenzie) of sexual harassment, and the fact that Plaintiff had been advised (by the Company)

20

that he was under investigation as a consequence of McKenzie's allegations. Such facts concerned the private life of Plaintiff, an individual, not his public life. Plaintiff had a right to privacy concerning the existence of the accusation and the Company's response, and particularly with respect to the details of the accusation and response.

108.    Recognizing the inherently private nature of an investigation into sexual harassment allegations (not to mention the details of such investigation), Fujitec's company policy gave employees the entirely reasonable expectation that such matters were, in fact, private.

109.    Krupp violated Plaintiff's right to privacy by disclosing both the fact that Plaintiff had been accused of sexual harassment, and the fact that Plaintiff had been advised that the Company was investigating Plaintiff.

110.    The facts disclosed by Krupp are highly offensive and objectionable to a reasonable person of ordinary sensibilities.

111.    Krupp's disclosures were intentional and the facts publicized were not of legitimate concern to the public or any of the individuals to whom Krupp made the disclosure.

112.    Upon information and belief, Krupp disclosed the aforementioned facts at an informal social gathering, in the presence of alcohol, to a large group of people, including both Company employees and non-employees, none of whom had any legitimate reason to know and/or have any interest in the facts disclosed.

113.    Plaintiff avers, upon information and belief, that Krupp disclosed the aforementioned facts in a manner which ensured that they became, or were substantially certain to become, public knowledge, given the number and variety of individuals to whom Krupp

published the information, and the informal, social environment in which Krupp made the publication.

114.    Upon information and belief, the aforementioned facts became even more widely known after individuals to whom Krupp initially published the aforementioned facts thereafter foreseeably repeated those same malicious and damaging facts to a significant number of additional individuals, including additional Company employees and non-employees, and those additional individuals in turn foreseeably repeated those facts to still more additional individuals, none of whom had a right to know.

115.    Plaintiff cannot possibly state precisely how widely those facts were spread as a direct and foreseeable consequence of Krupp's initial publication.  However, Plaintiff avers, upon information and belief, that through discovery the full extent of the "reach" of Krupp's publicizing of those facts shall be made known.

116.    Thus, the statements made by Krupp wherein he divulged the private facts concerning McKenzie's allegation and the Company's response constitutes "a communication that reaches, or is sure to reach, the public" pursuant to the standard set forth in *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 53.

117.    Krupp's intentional and improper disclosure of otherwise confidential information caused serious damage to the reputation of Plaintiff who was an otherwise innocent employee with a stellar employment record.

118.    As a direct and proximate result of Krupp's intentional, illegal, and wrongful conduct, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

### COUNT IV
### False Light Invasion of Privacy (Krupp)

119.     Plaintiff incorporates herein by reference paragraphs 1-118 of the First Amended Verified Complaint and further avers as follows:

120.     Krupp's disclosure of facts concerning the private life of Plaintiff (i.e., the purported investigation of Plaintiff arising out of the McKenzie allegations of sexual harassment, and any facts related thereto), gave publicity to a matter concerning Plaintiff that placed Plaintiff in a false light.

121.     In particular, at the same time and in the same manner as he disclosed and publicized facts as set forth in paragraphs 107-117 above, Krupp also repeated and publicized the false defamatory statements made by McKenzie in accusing Plaintiff of sexual harassment, thereby placing Plaintiff in a false light.

122.     Krupp's detail of the allegations against Plaintiff were highly offensive to a reasonable person because McKenzie's allegations against Plaintiff were false and concerned a highly offensive subject, i.e., sexual harassment.

123.     In disclosing and repeating McKenzie's false statements regarding Plaintiff, Krupp had knowledge of and/or acted in reckless disregard as to the falsity of the matter and the false light in which Plaintiff would be placed.

124.     Upon information and belief, Krupp disclosed and repeated the aforementioned false statements at an informal social gathering, in the presence of alcohol, to a large group of people, including both Company employees and non-employees, none of whom had any need to know or any legitimate interest in the false statements.

125.     Upon information and belief, Krupp disclosed and repeated the aforementioned false statements in a manner which ensured that they became, or were substantially certain to

23

become, public knowledge, given the number and variety of individuals to whom Krupp disclosed and repeated the false statements, and the informal environment in which Krupp disclosed and repeated the false statements.

126.    Upon information and belief, the aforementioned false statements became even more widely known, and Plaintiff was further portrayed in a false light, after individuals to whom Krupp initially disclosed and repeated those statements thereafter foreseeably repeated those statements to a significant number of additional individuals, including additional Company employees and non-employees, and those additional individuals in turn foreseeably repeated those statements to still more additional individuals.

127.    Plaintiff cannot possibly state precisely how widely those false statements were spread as a direct and foreseeable consequence of Krupp's initial publication, i.e., disclosure and repetition thereof.  However, Plaintiff avers, upon information and belief, that through discovery the full extent of the "reach" of Krupp's publicizing of McKenzie's false statements shall be made known.

128.    Thus, the statements made by Krupp wherein he disclosed and repeated McKenzie's false statements regarding Plaintiff and his conduct constitute "a communication that reaches, or is sure to reach, the public" pursuant to the standard set forth in *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 53.

129.    As a direct and proximate result of Krupp's intentional, illegal, and wrongful conduct, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

## COUNT V
## Breach of Implied Contract

130.    Plaintiff incorporates herein by reference, as if fully rewritten, paragraphs 1-129 of the First Amended Verified Complaint and further avers as follows:

131.    Implied terms of employment existed as between Plaintiff and Fujitec Defendants, the key terms of which were set forth in Fujitec's employee handbooks, company policies, and/or oral statements by persons authorized to bind the Company in the employment relationship with Plaintiff.  An implied covenant of good faith and fair dealing is included in this employment contract.

132.    One of the relevant company policies adopted and enforced by Fujitec, and included in the implied contract, provided for a process for investigations and appeals concerning employee allegations of sexual harassment (previously referred to herein as "Policy").

133.    In the Policy, the Company agreed to investigate thoroughly allegations of sexual harassment and to "keep[] both parties informed as to the status of the investigation."

134.    In the Policy, the Company agreed to maintain the confidentiality of an investigation involving allegations of sexual harassment.

135.    In the Policy, the Company agreed that "[i]f either party directly involved in a sexual harassment investigation is dissatisfied with the outcome or resolution, that individual has the right to appeal the decision."  Additionally, the Company agreed that the appealing party has the right to have his/her appeal reviewed by an independent person, not previously involved in the underlying investigation.

136.    In the Policy, the Company agreed to present an appealing party with "findings within 30 calendar days" after receiving the appeal.

137. The promissory language set forth in the Policy created contractual terms of employment, which induced Plaintiff to remain employed with Fujitec, even though Plaintiff could have become employed elsewhere. By remaining employed with the Company, Plaintiff accepted the contractual terms offered by the Company through its Policy.

138. Defendants' actions, including, but not limited to: conducting a biased and incomplete investigation; failing to communicate the status and findings of the purported investigation; failing to allow Plaintiff to defend himself in the purported investigation based upon false allegations; denying Plaintiff his appeal rights in violation of the Company's Policy; and ultimately terminating Plaintiff in the manner set forth in the First Amended Verified Complaint were directly contrary to the terms of the Policy and thus constitute a breach of the implied contract between Plaintiff and the Fujitec Defendants.

139. Another of the relevant company policies adopted and enforced by Fujitec, and included in the implied employment contract, provided that the Company would not discriminate against its employees and that the Company would not tolerate or otherwise cause the harassment of employees.

140. The promissory language set forth in the handbooks and company policies created contractual terms of employment, which induced Plaintiff to remain employed with Fujitec, even though Plaintiff could have become employed elsewhere. By remaining employed with the Company, Plaintiff accepted the contractual terms offered by the Company through its handbooks and company policies.

141. Defendants' actions including, but not limited to, discriminating against Plaintiff and allowing or causing the harassment of Plaintiff as set forth in the First Amended Verified

Complaint were directly contrary to the terms of the aforementioned policy and thus constitute a breach of the implied contract between Plaintiff and the Fujitec Defendants.

142. One of the relevant oral statements made by or on behalf of Fujitec, and included in the implied employment contract, provided that the Company would provide Plaintiff an annual bonus of 17.5% of his base pay and an annual pay increase. From 2012 through 2019, inclusive, Fujitec honored the terms of this implied employment contract by providing Plaintiff an annual bonus of 17.5% of his base pay and an annual pay increase.

143. The promissory language regarding Defendants' oral statements concerning compensation in the preceding paragraph created contractual terms of employment, which induced Plaintiff to remain employed with Fujitec, even though Plaintiff could have become employed elsewhere. By remaining employed with the Company, Plaintiff accepted the contractual terms offered by the Company through Defendants' oral statements concerning compensation as set forth in the First Amended Verified Complaint.

144. Defendants' actions including, but not limited to, its refusal to grant Plaintiff an annual bonus of 17.5% of his base pay in 2019 and an annual pay increase for 2020, and thereafter, in the manner set forth herein were directly contrary to the aforementioned oral statements and thus constitute a breach of an implied contract between Plaintiff and the Fujitec Defendants.

145. As a direct and proximate result of Defendants' intentional, illegal, and wrongful conduct, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

## COUNT VI
## Promissory Estoppel

146.    Plaintiff incorporates herein by reference, as if fully rewritten, paragraphs 1-145 of the First Amended Verified Complaint and further avers as follows:

147.    Defendants made certain representations to Plaintiff by way of employee handbooks, Company policies, and/or oral representations including, but not limited to, the following:

    a.    Defendants' investigation of Plaintiff would be unbiased and thorough;

    b.    Defendants would communicate the status and factual findings of the investigation to Plaintiff;

    c.    Plaintiff would have the opportunity to defend himself in an investigation against him, including the right to appeal the factual findings of the investigation;

    d.    The investigation of Plaintiff and related facts would be kept confidential;

    e.    Plaintiff would receive an annual bonus of 17.5% of his then base pay; and

    f.    Plaintiff would receive his usual and customary annual pay increase of approximately 5% of his then base pay.

148.    Defendants had a reasonable expectation that such representations would be relied upon by Plaintiff and others to whom such representations were made.

149.    Plaintiff justifiably relied upon Defendants' representations, and did so to his detriment.

150.    As a direct and proximate result of Defendants' intentional, illegal, and wrongful conduct set forth herein, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

<u>**COUNT VII**</u>
<u>**Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, as amended**</u>

151.    Plaintiff incorporates herein by reference, as if fully rewritten, paragraphs 1-150 of the First Amended Verified Complaint and further avers as follows:

152.    Fujitec is an employer of more than 200 employees.

153.    Fujitec Co., Ltd. is an employer of more than 10,000 employees.

154.    Plaintiff is an African-American male.

155.    Plaintiff was subject to disparate treatment by Defendants based on his race.

156.    Defendants' aforementioned actions were taken because of Plaintiff's race and, thus, constitute unlawful discriminatory practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, as amended.  Such discriminatory actions included, but are not limited to: refusing to consider Plaintiff's request for pay equity, i.e., an increase in salary, despite granting similarly-situated Caucasian employees such an increase; unilaterally removing responsibilities from Plaintiff, thus interfering with his job duties and responsibilities; withholding information to which Plaintiff historically had received and was required to receive in order to perform his job; making false allegations of harassment; conducting a biased and incomplete investigation of Plaintiff arising out of false allegations by McKenzie; failing to communicate the status and factual findings of the investigation; failing to allow Plaintiff to defend himself in an investigation based upon false allegations; denying Plaintiff his appeal rights in violation of the Company's Policy; ultimately terminating Plaintiff in the manner set forth herein; and treating Plaintiff differently than similarly-situated Caucasian employees (i.e., the Comparators).

157. Moreover, Plaintiff avers that Defendants denied Plaintiff his procedural and substantive due process rights to an unbiased investigation and appeal as an intentional act of discrimination and retaliation against Plaintiff.

a. Pursuant to Fujitec's handbooks and Company policies in effect at all times relevant hereto, Plaintiff was entitled to certain due process rights, including but not limited to: an unbiased, thorough investigation; the right to be informed as to the status of the investigation, as well as the ultimate factual findings of the investigation; the right to confidentiality with respect to the investigation; the right to appeal the investigation; and the right to an independent third party (i.e., someone "who did not make the initial determination") to consider the appeal of the factual findings of the investigation.

b. Plaintiff's procedural due process rights were violated when he was terminated without full and complete notice and a reasonable opportunity to defend himself as set forth previously herein.

c. Plaintiff's substantive due process rights were violated when Plaintiff was terminated without being afforded an unbiased investigation of the allegations against him as required by the Company's Policy.

d. Plaintiff's substantive due process rights were further violated when Plaintiff sought redress for this violation of his due process rights by submitting an appeal, and Defendants refused to consider his appeal request altogether in violation of the Company's Policy.

e. Plaintiff avers, upon information and belief, that such due process rights were not denied to similarly-situated non-African American employees.

158.     As a direct and proximate result of Defendants' intentional, illegal, and wrongful conduct, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

**COUNT VIII**
**Retaliation (Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, as amended)**

159.     Plaintiff incorporates herein by reference, as if fully rewritten, paragraphs 1-158 of the First Amended Verified Complaint and further avers as follows:

160.     Defendants' aforementioned actions constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, as amended.  Such actions include, but are not limited to: denying Plaintiff his annual bonus and annual pay increase; conducting a biased and incomplete investigation of Plaintiff upon false accusations; intentionally denying Plaintiff his due process rights; and terminating Plaintiff after Plaintiff raised reasonable concerns of disparate treatment, i.e., pay inequity with respect to similarly-situated employees (i.e., the Comparators).

161.     As a direct and proximate result of Defendants' intentional, illegal, and wrongful conduct, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

**COUNT IX**
**Discrimination**

162.     Plaintiff incorporates herein by reference, as if fully rewritten, paragraphs 1-161 of the First Amended Verified Complaint and further avers as follows:

163.     Plaintiff is an African-American male.

164.     At all relevant times, Plaintiff was an "employee" pursuant to Ohio Rev. Code § 4112.01(A)(3) and Defendants were "person[s]" and "employer[s]" pursuant to Ohio Rev. Code § 4112.01(A)(1) and (2).

165.    Defendants' aforementioned actions were taken because of Plaintiff's race and thus constitute unlawful discriminatory practices in violation of Ohio law, specifically Rev. Code § 4112.02(A) and (J), Rev. Code § 4112.99.  Such actions include but are not limited to: refusing to consider Plaintiff's request for an increase in salary despite granting similarly-situated Caucasian employees such an increase (i.e., the Comparators); denying Plaintiff his annual bonus; denying Plaintiff his usual and customary annual pay increase; unilaterally removing responsibilities from Plaintiff; withholding information to which Plaintiff historically had received and was required to receive in order to perform his job duties and responsibilities; making false allegations of harassment; conducting a biased and incomplete investigation of Plaintiff arising out of false allegations by McKenzie; failing to communicate the status and factual findings of the investigation; failing to allow Plaintiff to defend himself in an investigation based upon false allegations; denying Plaintiff his appeal rights in violation of the Company's Policy; terminating Plaintiff in the manner set forth herein; and treating Plaintiff differently than similarly-situated Caucasian employees (i.e., the Comparators).

166.    As a direct and proximate result of Defendants' intentional, illegal, and wrongful conduct, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

## COUNT X
### Retaliation

167.    Plaintiff incorporates herein by reference, as if fully rewritten, paragraphs 1-166 of the First Amended Verified Complaint and further avers as follows:

168.    Defendants' aforementioned actions constitute retaliation in violation of state and federal laws.  Such actions include but are not limited to: denying Plaintiff his annual bonus; denying Plaintiff his usual and customary annual pay increase; conducting a biased and

incomplete investigation of Plaintiff upon false accusations; terminating Plaintiff after Plaintiff raised reasonable concerns of disparate treatment, i.e., pay inequity involving similarly-situated employees (i.e., the Comparators).

169.    As a direct and proximate result of Defendants' intentional, illegal, and wrongful conduct, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

**COUNT XI**
**Intentional Infliction of Emotional Distress**

170.    Plaintiff incorporates herein by reference, as if fully rewritten, paragraphs 1-169 of the First Amended Verified Complaint and further avers as follows:

171.    At all relevant times, as described herein, Defendants acted with the express intent of causing serious emotional distress to Plaintiff, or knew or should have known that their conduct would result in serious emotional distress to Plaintiff.

172.    Defendants' conduct was outrageous and extreme and beyond all possible bounds of decency and considered utterly intolerable in a civilized community.

173.    Defendants' aforementioned conduct extends far beyond the employment issues set forth herein.  Defendants' aforementioned conduct involves the intentional destruction of an individual's reputation, both in his professional and personal life and/or communities.

174.    Defendant McKenzie intentionally and maliciously fabricated allegations against Plaintiff which are extremely personal in nature and which caused substantial damage to Plaintiff's character and reputation, as well as causing damage to, if not altogether destroying, Plaintiff's relationship with his family members and, most significantly, his most sacred and personal relationship – his marriage.

175. McKenzie was not merely an employee neutrally reporting a violation of company policy. She knowingly and intentionally fabricated and disseminated outrageous allegations about Plaintiff that she knew to be entirely false, and the repercussions of which extend far beyond Plaintiff's loss of employment.

176. Defendants Fujitec and Krupp were not merely an employer and/or supervisor who were merely responding to a report of a violation of company policy. They knowingly and intentionally further disseminated McKenzie's outrageous and false allegations about Plaintiff. They knowingly misapplied their own corporate policies regarding employee investigations to inquire into the personal details of Plaintiff's life, and publicize details of the extremely private investigation. Their evident purpose in so doing was to intimidate Plaintiff and either induce Plaintiff to resign or cause him to make statements Defendants could use (as a pretext) to terminate his employment (consistent with *Smith v. GE Aviation*, S.D.Ohio No. 3:10-cv-013, 2011 U.S. Dist. LEXIS 119693, at *9-10 (Aug. 31, 2011)).

177. Such conduct in (1) maliciously spreading lies about Plaintiff and (2) "perverting" the corporate policies amounts to outrageous conduct that "rightly" causes Plaintiff "serious anguish" and pursuant to the standard of *Mango v. City of Columbus*, S.D.Ohio No. 2:19-cv-3120, 2020 U.S. Dist. LEXIS 161340, at *50-52 (Sep. 3, 2020).

178. Defendants' conduct goes beyond mere annoyances, hurt feelings, insults, rough language, or bad manners that a reasonable person is expected to endure. In fact, Defendants' conduct caused Plaintiff serious emotional distress that was of such a nature that no reasonable person could or should endure.

179. The circumstances suffered by Plaintiff are "more than just allegations of race discrimination relative to his employment" (pursuant to the standard of *Willis v. Cleveland*

34

*Metro. School Dist.*, N.D.Ohio No. 1:17CV1112, 2018 U.S. Dist. LEXIS 68717, at *9-10 (Apr. 24, 2018)).

180.     As a direct and proximate result of Defendants' intentional, illegal, and wrongful conduct, Plaintiff has been damaged in an amount not yet subject to accurate determination, but not less than ONE MILLION AND NO/100 DOLLARS ($1,000,000).

**WHEREFORE,** Plaintiff prays for judgment in his favor and against Defendants and requests that this Court enter judgment as follows:

1.     On Count One, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

2.     On Count Two, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

3.     On Count Three, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

4.     On Count Four, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

5.     On Count Five, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

6.      On Count Six, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

7.      On Count Seven, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

8.      On Count Eight, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

9.      On Count Nine, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

10.     On Count Ten, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

11.     On Count Eleven, award compensatory damages, jointly and severally, in an amount not yet subject to accurate determination but believed to be in excess of ONE MILLION AND NO/100 DOLLARS ($1,000,000);

12.     With respect to Counts One through Eleven, inclusive, award punitive damages in an amount no less than TEN MILLION AND NO/100 DOLLARS ($10,000,000);

13.     Reasonable attorney's fees and the costs/expenses of litigation;

14.     Prejudgment and post judgment interest; and

15. Such other and further relief as the Court may find appropriate and allowed by law.

Respectfully submitted,

*/s/ Jonathan Hollingsworth*

_____

Jonathan Hollingsworth (0022976)
HOLLINGSWORTH & WASHINGTON, LLC
6494 Centerville Business Parkway
Centerville, Ohio 45459
(937) 424-8556 (telephone)
(937) 424-8557 (fax)
E-mail address: jhollingsworth@jhallc.com

Attorney for Plaintiff Darryl Mitchell

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues joined herein.

*/s/ Jonathan Hollingsworth*

_____

Jonathan Hollingsworth

## <u>VERIFICATION</u>

The undersigned hereby certifies that the foregoing allegations set forth in the First Amended Verified Complaint are true and accurate.

DARRYL MITCHELL

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing has been served upon:

Jazmyn J. Stover
FISHER &PHILLIPS LLP
200 Public Square, Suite 4000
Cleveland, Ohio 44114

Martin B. Heller
JonVieve D. Hill
*Admitted Pro Hac Vice
FISHER &PHILLIPS LLP
1075 Peachtree Street, NE, Suite 3500
Atlanta, Georgia 30309

Neal Shah
Katherine M. Collier
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street, Suite 3300
Cincinnati, Ohio 45202

by operation of the court's electronic filing system and/or regular United States mail, postage prepaid, on this 6th day of March, 2021.

*/s/ Jonathan Hollingsworth*

_____

Jonathan Hollingsworth