## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**DARRYL MITCHELL,**

       **Plaintiff,**

     **v.**                   **Case No. 1:20–cv–363**
                                   **JUDGE DOUGLAS R. COLE**

**FUJITEC AMERICA, INC., et al.,**

       **Defendants.**

### OPINION AND ORDER

This action is now before the Court on Defendants Fujitec America, Inc. ("Fujitec America"), Fujitec Co., Ltd. ("Fujitec Co."), and Fujitec America's Chief Executive Officer Gary Krupp's (collectively the "Fujitec Defendants") Motion to Partially Dismiss (Doc. 21) Plaintiff Darryl Mitchell's Amended Complaint (Doc. 19). For the reasons explained below, the Court **GRANTS** the Motion (Doc. 21) **IN PART** and **DENIES** it **IN PART**.

### BACKGROUND[1]

Mitchell began working as in-house counsel for Fujitec America in 2012.[2] (Am. Compl., Doc. 19, #227). In 2013, Fujitec promoted him to Chief Legal Officer, the

---

[1] The Court has already extensively discussed the factual background of this case in its previous Opinion and Order (Doc. 18). The Court reproduces and abbreviates that discussion here.

[2] As this case is before the Court on the Fujitec Defendants' Motion to Dismiss (Doc. 21), the Court accepts the facts in Mitchell's Amended Complaint (Doc. 19) as true for purposes of the instant Motion (Doc. 21). *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002) (citing *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit,* 507 U.S. 163, 164 (1993)).

position he maintained until Fujitec terminated his employment in early 2020. (*Id.* at #227, 236). That parting of ways gave rise to this lawsuit.

According to Mitchell, near the end of 2019, he approached Gary Krupp, Fujitec America's Chief Executive Officer, to inquire about what Mitchell believed were pay inequities relating to Mitchell's compensation. (*Id.* at #230). In particular, Mitchell, an African American, alleges that he complained to Krupp about making less than "similarly-situated Caucasian counterparts." (*Id.* at #230–31). Krupp declined to discuss the issue, and rejected Mitchell's request for increased compensation. (*Id.* at #231). Mitchell further claims that, at about this same time, Krupp began stripping job responsibilities from Mitchell and interfering with Mitchell's access to information that Mitchell contends was important to his professional duties. (*Id.*).

A few weeks after Krupp denied Mitchell's request for additional compensation, Krupp came to Mitchell's office to inform him that another Fujitec employee, Shawnez McKenzie, had filed a complaint against Mitchell with human resources. (*Id.* at #232). Krupp, along with Fujitec's Controller, Daiji Yoshimura, who was also present for the meeting, declined to provide any specifics about McKenzie's allegations. (*Id.*). But, immediately after the meeting, Krupp asked Mitchell to report to a conference room where Fujitec's outside counsel Betsy Turner, retained to investigate the complaint, interviewed him. (*Id.* at #232–33).

During the interview, Mitchell learned that McKenzie had alleged that Mitchell sexually harassed her. Specifically, McKenzie claimed that Mitchell had "propositioned" her. (*Id.* at #233). Further, McKenzie stated that Mitchell had

allegedly grabbed her by the waist in the office breakroom. (*Id.*). Questions posed to Mitchell by Turner further suggested that McKenzie had asserted to human resources that Mitchell visited her at her home, and had engaged in inappropriate conversation during a ten-minute phone call. (*Id.* at #233–34).

The next day, Fujitec placed Mitchell on administrative leave. (*Id.* at #234). A day after that, Fujitec denied Mitchell access to the company's "computers and telecommunication system." (*Id.*). Mitchell further claims that, contrary to Fujitec's policy for workplace investigations, the company refused to provide status updates throughout the review process. (*See id.* at #234–35).

On January 21, 2020, Mitchell learned from a co-worker that Krupp had shared details surrounding McKenzie's allegations to other "non-authorized" employees. (*Id.* at #235). This discussion allegedly occurred during a social gathering for dinner and drinks. (*Id.*). Mitchell believes none of the employees present had a "need to know" about McKenzie's complaint or the ensuing investigation. (*Id.*).

On February 3, 2020, Krupp asked Mitchell to bring his Fujitec laptop to work on February 5, 2020, so that the company could install "new anti-virus software." (*Id.* at #235–36). When Mitchell showed up that day, he discovered that his badge no longer provided him access to the company building. (*Id.* at #236). Krupp met Mitchell and escorted him to a conference room. Once there, Krupp told Mitchell that the company determined Mitchell had violated Fujitec's sexual harassment policy, and that Mitchell was terminated, effective immediately. (*Id.*). Mitchell claims that, in

doing so, Krupp refused to provide any details regarding that determination, once again contrary to Fujitec policy. (*Id.*).

According to Mitchell, McKenzie fabricated her sexual harassment allegations. (*Id.* at #237). Mitchell further claims that she did so because Mitchell, in his capacity as Chief Legal Officer, had investigated McKenzie and one of her colleagues for alleged workplace misconduct. (*Id.*). Given that incident, McKenzie brought allegations against Mitchell "to shield herself from otherwise legitimate employment action, i.e., termination for poor job performance." (*Id.*). Mitchell believes that any "thorough and complete investigation" would have revealed the falsity of the charges against him, but that the company failed to conduct one because of its preordained decision to terminate him. (*See id.* at #238).

All of that said, it is not entirely clear that Mitchell is asserting that his alleged violation of the sexual harassment policy was even the basis for his termination. That is so because Mitchell separately alleges that Krupp informed Mitchell that the primary reason for his termination was that Mitchell had withheld information regarding wrongdoing by Fujitec's former Chief Financial Officer, Ray Gibson. (*Id.* at #239). And Krupp may have relied on that reason despite the fact that the Gibson incident occurred "years prior" to Mitchell's termination and Mitchell's knowledge about Gibson's misconduct only "arose out of rumors." (*Id.*).

In any event, Mitchell appealed his termination pursuant to Fujitec's written workplace policies. (*Id.* at #240). Mitchell contends that Fujitec failed to abide by the

procedures set forth in those policies. (*See generally id.* at #240–42). On March 11, 2020, Fujitec informed Mitchell that it was denying his appeal. (*Id.* at #241).

Based on these facts, Mitchell filed a twelve-count Complaint (Doc. 1) against McKenzie, Krupp, Fujitec America and Fujitec Co. (the Japanese parent corporation). He asserted Ohio-law claims for (1) wrongful termination in violation of public policy (called a *Greeley* claim); (2) defamation; (3) invasion of privacy (Krupp only); (4) false light (Krupp only); (5) breach of implied contract; (6) breach of the covenant of good faith and fair dealing; (7) promissory estoppel; and (8) intentional infliction of emotional distress. He also asserted claims for discrimination and retaliation under both Title VII (two counts) and corresponding state law (two counts).

In response to the Complaint, both McKenzie and the Fujitec Defendants filed motions to dismiss (Docs. 10, 11). The Court issued its Opinion and Order (Doc. 18) on those motions on February 8, 2021. The Court found that Mitchell plausibly stated a promissory estoppel claim with respect to all defendants except McKenzie and a claim for defamation against all Defendants other than Fujitec Co., Ltd. (*See* Op., Doc. 18, #195, 216). On all other claims, though, the Court held that Mitchell had failed to state a claim. (*See id.* at #223–24). But the Court dismissed many of those deficient claims without prejudice, granting Mitchell leave to submit an amended complaint to remedy the pleading defects the Court identified. (*Id.* at #224).

Mitchell filed his Amended Complaint (Doc. 19) on March 6, 2021. This time, McKenzie filed an Answer (Doc. 20) and did not move to dismiss Mitchell's remaining claims against her. But the Fujitec Defendants again moved to dismiss (Doc. 21)

many of the claims in Mitchell's Amended Complaint (Doc. 19), arguing that Mitchell's factual allegations failed to rectify the relevant deficiencies in his original Complaint (Doc. 1). Mitchell responded in opposition (Doc. 23) on April 12, 2021, and the Fujitec Defendants replied in support (Doc. 26) on May 4, 2021. The matter is now fully briefed and before the Court.

## LEGAL STANDARD

At the motion to dismiss stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [Mitchell] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that assessment, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That is true, however, only as to factual allegations. The Court need not accept as true Mitchell's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 546–47. Under the *Twombly/Iqbal* plausibility standard, courts play an important

gatekeeper role, ensuring that claims meet a plausibility threshold before defendants are subjected to the potential rigors (and costs) of discovery. "Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly-stated claims." *Green v. Mason*, No. 1:19-cv-14, 2020 WL 7028466, at \*7 (S.D. Ohio Nov. 30, 2020).

## LAW AND ANALYSIS

As a general matter, the Fujitec Defendants argue that Mitchell's Amended Complaint (Doc. 19) fails for the same reasons that the allegations of his original Complaint (Doc. 1) were insufficient to state a claim for relief. (*See* Mot. to Dismiss Am. Compl. ("Mot."), Doc. 21, #294–95). The Court largely agrees. The Court separately discusses below each claim at issue on the instant Motion (Doc. 21).

### A. Mitchell Fails To State A *Greeley* Claim For Termination In Violation Of Public Policy (Count I).

As the Court explained in its previous Opinion (Doc. 18, #192), employment in Ohio is generally governed by the employment-at-will doctrine. *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 529 (Ohio 2002). Accordingly, an employer generally may terminate an employee for any reason at any time, and that terminated employee may not sue the employer for wrongful discharge. *Id.* But there are exceptions to this doctrine. One such exception, relevant here, allows a terminated employee to bring a wrongful discharge claim when the discharge violates public policy, which Ohio courts commonly refer to as a *Greeley* claim. *Miracle v. Ohio Dep't of Vets. Servs.*, 137 N.E.3d 1110, 1113 (Ohio 2019) (citing *Greeley v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990)).

Making a claim for wrongful discharge in violation of public policy—a *Greeley* claim—requires that a plaintiff establish each of four elements: "(1) that a clear public policy existed and was manifested either in a state or federal constitution, statute, or administrative regulation, or in the common law ('the clarity element'); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy ('the jeopardy element'); (3) that the plaintiff's dismissal was motivated by conduct related to the public policy ('the causation element'); and (4) that the employer lacked an overriding legitimate business justification for the dismissal ('the overriding justification element')." *Miracle*, 137 N.E.3d at 1113 (citing *Collins v. Rizkana*, 652 N.E.2d 653, 657–58 (Ohio 1995)). The first two elements—clarity and jeopardy—are questions of law for the Court, whereas the last two elements—causation and overriding justification—are generally issues for the factfinder. *Collins*, 652 N.E.2d at 658.

Here, the Fujitec Defendants challenge Mitchell's ability to establish the clarity and jeopardy requirements. (Mot., Doc. 21, #300). As the Sixth Circuit has noted, the clarity element requires Mitchell to identify a *clear* public policy manifested in a statute, rule, or the common law. *See Jakischa v. Cent. Parcel Express*, 106 F. App'x 436, 440 (6th Cir. 2004) ("Since *Greeley* was decided, the Ohio Supreme Court has held that the 'clear public policy' sufficient to justify a wrongful-discharge claim 'may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and

regulations, and the common law.'") (quoting *Painter v. Graley*, 639 N.E.2d 51, 52 (Ohio 1994)).

The jeopardy element asks whether "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy." *Miracle*, 137 N.E.3d at 1113. In conducting that inquiry, the Court must:

> (1) determine what kind of conduct is necessary to further the public policy at issue; (2) decide whether the employee's actual conduct fell within the scope of conduct protected by this policy; and (3) consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal.

*Allman v. Walmart, Inc.*, 967 F.3d 566, 574 (6th Cir. 2020) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003)). Of particular importance here, the jeopardy analysis also involves inquiring "into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful discharge claim." *Shingler v. Provider Servs. Holdings, L.L.C.*, No. 106383, 2018 WL 3414268, at *5 (Ohio Ct. App. July 12, 2018). The Ohio Supreme Court in *Wiles*, 773 N.E.2d at 531, explained it like this:

> If the statute that establishes the public policy contains its own remedies, it is less likely that tort liability is necessary to prevent dismissals from interfering with realizing the statutory policy. … Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.

That is, as a general matter, a plaintiff cannot use a statute or regulation as the basis for a *Greeley* claim, if the statute or regulation at issue contains its own penalty provisions. *See Jakischa*, 106 F. App'x at 440 (finding that the Ohio Revised Code

provided "adequate statutory remedy" to preclude a *Greeley* claim for wrongful discharge under the jeopardy prong).

In the Court's previous Opinion (Doc. 18, #194), the Court noted that most of the public policies that Mitchell cited in his original Complaint (Doc. 1) were related to race discrimination or retaliation for reporting race discrimination. Ohio law—in particular O.R.C. § 4112—already provides a "full panoply of remedies, including compensatory and punitive damages," *see Wakefield v. Children's Hospital*, No. C2-06-1034, 2008 WL 3833798, at *8 (S.D. Ohio Aug. 13, 2008), that "adequately protects society's interests," *Wiles*, 773 N.E. 2d at 531, on these issues. Thus, as in *Wiles*, "there [was] no need to recognize a common-law action for wrongful discharge." *Id.*

Separately, as the Court's previous Opinion (Doc. 18, #195) also determined, to the extent that the "public policies" to which Mitchell alluded in his original Complaint (Doc. 1) were related to Fujitec's alleged failure to follow its own company policies, the claim failed for a different reason: a clear public policy must be manifested by some source of legal authority, such as a constitution, statute, or regulation, rather than only an employer's own workplace policies. *See Jakischa*, 106 F. App'x at 440.

In an attempt to remedy these deficiencies, Mitchell's Amended Complaint (Doc. 19) adds a new list of public policies against retaliation for employees who report wrongdoing. (*See id.* at #242–43). Mitchell argues that these public policies satisfy the jeopardy and clarity elements. (Resp. in Opp'n to Mot. ("Opp'n"), Doc. 23, #339). The list includes public policies against retaliating against employees for reporting

10

unlawful workplace conditions or conduct, reporting violations of company policy, asserting their constitutional rights, reporting corruption, and reporting financial misconduct including fraud. (*See* Am. Compl., Doc. 19, #242).

The Court agrees with the Fujitec Defendants that these conclusory recitations do not address the deficiencies the Court previously identified in Mitchell's wrongful discharge claim. (*See* Mot., Doc. 21, #300). To start, Mitchell's Amended Complaint (Doc. 19) nowhere explains what Mitchell reported, to whom he reported it, or how his termination amounted to retaliation for that report. Indeed, at one point, Mitchell's Amended Complaint (Doc. 19) appears to suggest the opposite, namely that the Fujitec Defendants' stated reason for terminating Mitchell was that Mitchell *failed* to report unspecified misconduct by Fujitec's former Chief Financial Officer, Ray Gibson. (Am. Compl., Doc. 19, #239).

Similarly, in his Response (Doc. 23) to the Fujitec Defendants' Motion (Doc. 21), Mitchell specifically refers only to "McKenzie's false allegations of sexual harassment and the Fujitec Defendants' acceptance of those false allegations" as the factual basis for his wrongful termination claim, again failing to tie those alleged facts to his Amended Complaint's (Doc. 19, #242–43) laundry list of public policies about retaliation for reporting wrongdoing. (*See* Opp'n, Doc. 23, #339).

Read with a most generous eye, Mitchell could be suggesting that his original denial that he sexually harassed McKenzie, or perhaps his later attempt to appeal his termination on that basis, constituted a report to the Fujitec Defendants that McKenzie had made false allegations of sexual harassment. (*See* Am. Compl., Doc.

19, #233, 240–42). Viewed in the light most favorable to Mitchell, the argument would go, McKenzie's false allegations of sexual harassment in turn violated (unspecified) laws or company policies, thus implicating some or all of the public policies pled in Mitchell's Amended Complaint (Doc. 19, #242–43).

But then a few more problems arise. First, Mitchell necessarily appealed his termination *after* he was fired, and therefore his termination itself could not have been in retaliation for that (subsequent) appeal. This matters because Mitchell asserts a claim for wrongful *termination*, not wrongful failure to re-hire, and nowhere suggests that his claim arises out of any post-termination events. (*See id.*).

Second, it is doubtful that Mitchell's Amended Complaint (Doc. 19), taken as a whole, gives rise to the plausible inference that the Fujitec Defendants terminated Mitchell in retaliation for *Mitchell's denial that he sexually harassed McKenzie*, rather than because they believed (wrongly and regardless of his denial) that Mitchell had in fact sexually harassed McKenzie, or because of racial discrimination, or because they believed (mistakenly or not) that Mitchell failed to disclose Gibson's apparently unrelated wrongdoing. (*See id.* at #239–40). And indeed, aside from his appeal, Mitchell's only other denial of the sexual harassment allegations mentioned in the Amended Complaint (Doc. 19) was made to an outside attorney for Fujitec in the course of an interview conducted as part of Fujitec's investigation of the sexual harassment allegations. (*See id.* at #233). It would be a stretch to call that "reporting" anything to the Fujitec Defendants.

Third, even ignoring this fatal absence of factual specificity, Mitchell's new list of policies also fails to remedy the pure legal defects in his original Complaint (Doc. 1) regarding this claim. With respect to the clarity element, Mitchell's claim still fails as a matter of law to the extent that it depends on company policies rather than sources of legal authority such as statutes, regulations, or common law. *See Jakischa*, 106 F. App'x at 440. And to the extent that the public policies concern retaliation against employees who report violations of laws, rather than of company policies, Mitchell does not identify any specific laws whose violation he reported.

Even if Mitchell had reported a violation of some specific law, which he fails to allege, Mitchell might also encounter a jeopardy problem, because various statutes already provide remedies for whistleblower employees who report employer conduct that violates certain laws. *See, e.g.*, 18 U.S.C. § 1514A (securities fraud); 29 U.S.C. § 660(c) (workplace safety violations). While existence of statutory remedies is not fatal to a *Greeley* claim where the clear public policy is *also* embodied in a *separate* statute from the one that provides for the remedies, *see, e.g., Miller v. MedCentral Health Sys., Inc.*, No. 2005CA0049, 2006 WL 44290, at *6 (S.D. Ohio Jan. 6, 2006), Mitchell does not identify any such "multiple-source" public policy (or indeed any source of pertinent public policy) at issue here.

To sum up, while Mitchell provides a new list of vague public policies, he fails to tie that list to the factual allegations of his Amended Complaint (Doc. 19), while also failing to identify any pertinent specific public policy that satisfies both the clarity and the jeopardy requirements as a matter of law. Because Mitchell fails to

allege a viable wrongful termination claim under Ohio law, the Court **DISMISSES** Count I of the Amended Complaint (Doc. 19), this time **WITH PREJUDICE**.

## B. Mitchell Fails To State A Claim For Invasion of Privacy By Publication Of Private Facts (Count III).

As the Court noted in its previous Opinion (Doc. 18, #210–11), under Ohio law, in order to establish a claim for invasion of privacy by publication of private facts, a plaintiff must show five elements:

> (1) There must be publicity; the disclosure of a public nature [*sic*], not private. "Publicity" means communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to "publication" as that term of art is used in connection with liability for defamation as meaning any communication by the defendant to a third person.

> (2) The facts disclosed must be those concerning the private life of an individual, not his public life. There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public, such as matters of public record about his birth or marriage date, or matters that the plaintiff leaves open to the public eye, such as kissing his spouse in public.

> (3) The matter publicized must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.

> (4) The publication must have been made intentionally, not negligently.

> (5) The matter publicized must not be a legitimate concern to the public. A newspaper's publicizing "legitimate news" ordinarily will not be actionable.

*Early v. The Toledo Blade*, 720 N.E.2d 107, 135–36 (Ohio Ct. App. 1998) (quotation omitted).

Measured against this standard, Mitchell's claim in his original Complaint (Doc. 1) failed for two reasons. First, Mitchell failed to plausibly allege that Krupp,

the sole Defendant against whom he asserted this claim, "publicized" Mitchell's alleged sexually harassing behavior to the extent necessary to sustain an invasion of privacy claim. At most, Mitchell contended that Krupp improperly "discussed the details of the [sexual harassment] inquiry with several Fujitec employees during a social gathering." (Compl., Doc. 1, #8). Sharing information within the corporation with "several" employees is not "communicating the matter to the public at large." *Early*, 720 N.E.2d at 135.

Second, the crux of an invasion of privacy claim is that the defendant has shared *true*, but private, facts about the plaintiff. (*See* Op., Doc. 18, #211). In his original Complaint (Doc. 1), Mitchell alleged that Krupp shared *untrue* facts. The Court held that this potentially gave rise to a claim for defamation (*see* Op., Doc. 18, #208–10), but not a claim for invasion of privacy.

In his Amended Complaint (Doc. 19), Mitchell tries to remedy each of these defects. As to publicity, Mitchell adds that non-employees, as well as employees, were among the "large group of people" at the "informal social gathering" where Krupp made the alleged statements, speculating that Krupp's statements to this group "ensured" that the sexual harassment allegations would become "public knowledge." (Am. Compl., Doc. 19, #245). And with respect to truth, Mitchell argues that it was true that McKenzie had made the allegations in question, even though Mitchell says that McKenzie's allegations themselves were untrue. (Opp'n, Doc. 23, #340).

Mitchell's additional factual allegations are insufficient with respect to at least the publicity element. The mere fact that a private corporate social event of

15

unspecified size includes some non-employees as well as employees of Fujitec does not make event attendees equivalent to "the public at large," and it also does not make it "substantially certain" that the content of statements made to a subgroup of those event attendees on a single occasion will become "public knowledge." *See Early*, 720 N.E.2d at 135–36. Mitchell's allegation to the contrary is merely conclusory. *See Iqbal*, 556 U.S. at 678; (*see also* Am. Compl., Doc. 19, #245). Because publicity is a necessary element of Mitchell's claim, the court need not, and does not, decide whether Mitchell also fails to allege that the publicized facts were true.

The Court accordingly **DISMISSES** Count III of Mitchell's Amended Complaint (Doc. 19) **WITH PREJUDICE**.

### C. Mitchell Fails To State A Claim For False Light Invasion Of Privacy (Count IV).

As the Court noted in its previous Opinion (Doc. 18, #211–12), the tort of false light subjects a defendant to liability for invasion of privacy if (1) "the false light in which the other was placed would be highly offensive to the reasonable person," and (2) "the actor had knowledge or acted with reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Welling v. Weinfeld*, 866 N.E.2d 1051, 1059 (Ohio 2007). Adopting the Restatement (Second) of Torts definition for false-light invasion of privacy, the Ohio Supreme Court in *Welling* recognized that "[t]he requirements imposed by the Restatement make a false-light claim difficult to prove." *Id.* at 1057.

Of particular importance here, a false light claim, like an invasion of privacy claim, requires that "the information must be 'publicized,' which is different from

'published.'" *Id.* "Publicity … means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* Something that is publicized "reaches, or is sure to reach, the public." *Id.* (quoting Restatement (Second) of Torts, § 652D, cmt. a).

For the same reasons that Mitchell's allegations failed to show "publicity" to support the publication of private facts claim, they also fail to establish that element of a false light claim. The Court thus **DISMISSES** Count IV of Mitchell's Amended Complaint (Doc. 19) **WITH PREJUDICE**.

### D. Mitchell States A Claim For Breach Of Contract (Count V), But Only With Respect To The Alleged Oral Promises Of Compensation.

As stated in the Court's previous Opinion (Doc. 18, #213–14), to successfully state a breach of contract claim under Ohio law, a plaintiff must plausibly allege "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Johnson v. Delphi Corp.*, 261 F. Supp. 2d 955, 961 (S.D. Ohio 2003). As for an *implied* contract in the employment context, "[g]iven the presumption of at-will employment, the party seeking to prove the existence of an implied contract has a heavy burden because all of the elements of a contract must be established, including a 'meeting of the minds' to show that employment was intended to be other than at-will." *Galgoczy v. Chagrin Falls Auto Parts, Inc.*, No. 94281, 2010 WL 3816328, at *1 (Ohio Ct. App. Sept. 30, 2010) (citing *Penwell v. Amherst Hosp.*, 616 N.E.2d 254, 258 (Ohio Ct. App. 1992) and *Cohen & Co., CPAs v. Messina, CPA*, 492 N.E.2d 867, 879 (Ohio Ct. App. 1985)); *see also Finsterwald-*

*Maiden v. AAA S. Cent. Ohio*, 685 N.E.2d 786, 789 (Ohio Ct. App. 1996) ("Without such mutual assent to be bound by the handbook, the handbook is simply a unilateral statement of rules and policies that creates no obligations or rights.") (citations omitted).

The Court previously found no fundamental legal infirmity in Mitchell's attempt to use an employee handbook to support a breach of implied contract claim. (*See* Op., Doc. 18, #213–14 (citing *Finsterwald-Maiden*, 685 N.E.2d at 789 and *Galgoczy*, 2010 WL 3816328, at *1 (Ohio Ct. App. Sept. 30, 2010))). But the Court also found that Mitchell failed to state a claim because he identified neither the specific portions of the handbook that created the contractual obligations at issue nor the "clear promissory language" that would make them part of an implied contract under Ohio law. (*See id.* at #214).

In his Amended Complaint (Doc. 19), Mitchell identifies specific provisions in two of Fujitec America's policies, the policy for investigating claims of sexual harassment and the policy against discrimination, as the implied contract terms Mitchell claims Fujitec America violated. (*See* Am. Compl., Doc. 19, #249–50). But Mitchell fails to point to any "clear promissory language" that would create an implied contract between Mitchell and Fujitec America whose terms included these policies. (*See id.*). Like many employers, Fujitec has policies against both harassment and discrimination, and these include various procedural provisions regarding investigation and appeal. But Mitchell's Amended Complaint (Doc. 19) contains no reference to any specific language that suggests that in adopting such policies, Fujitec

18

was undertaking a contractual obligation either to its employees generally or to Mitchell in particular. *See Rigby v. Fallsway Equip. Co., Inc.*, 779 N.E.2d 1056, 1060 (Ohio Ct. App. 2002) ("Generally, employee handbooks do not constitute an employment contract.") (citation omitted). In the absence of any such indication of "mutual assent," Mitchell has failed to allege that the policies at issue were anything other than "a unilateral statement of rules and policies that creates no obligations or rights." *See Finsterwald-Maiden*, 685 N.E.2d at 789. Accordingly, even if Fujitec violated its own policies, Mitchell still fails to allege that any clear promissory language gave those policies contractual effect.

The situation is somewhat different as to Fujitec America's alleged oral promises that Mitchell would receive a 17.5% bonus every year as well as an annual salary increase, promises Fujitec America allegedly broke by paying Mitchell no bonus in 2019 and failing to increase his salary in 2020. (Am. Compl., Doc. 19, #251). An oral promise to pay a particular bonus or salary increase could amount to an express oral contract, rather than an implied contract. *See Dunn v. Bruzzese*, 874 N.E.2d 1221, 1228 (Ohio Ct. App. 2007) ("In express contracts, assent to the terms of the contract is actually expressed in the form of an offer and an acceptance. On the other hand, in implied-in-fact contracts the parties' meeting of the minds is shown by the surrounding circumstances … that make it inferable that the contract exists as a matter of *tacit* understanding.") (emphasis added) (internal citation omitted). But, either way, the Court finds that the allegations that the Fujitec Defendants did not fulfill specific oral promises to Mitchell concerning his compensation for periods prior

to his termination suffice to plausibly state a claim for breach of contract. Unlike general policies in an employee handbook unaccompanied by clear promissory language, specific promises of compensation to a particular employee plausibly constitute terms in an employment contract. *See Foley v. Empire Die Casting Co., Inc.*, No. 24558, 2009 WL 3366269, at *8 (Ohio Ct. App. Oct. 21, 2009) (upholding jury verdict for employee on claim for breach of contract based on failure to pay bonus). Naturally, to prevail, Mitchell will need to *prove* that Fujitec made such promises, and that there was a "meeting of the minds" so as to constitute a contract. *See Galgoczy*, 2010 WL 3816328, at *1. But Mitchell has plausibly alleged a breach of oral contract at this stage.

The Fujitec Defendants argue that the alleged oral promises cannot form a basis for a breach of contract claim because they were not accompanied by any promise of continued employment. (*See* Mot., Doc. 21, #305). They cite *Weiper v. W.A. Hill & Assocs.*, 661 N.E.2d 796, 803 (Ohio Ct. App. 1995), for the proposition that "a promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the well-established doctrine of employment at will." (*Id.*). But promissory estoppel and breach of contract are two different theories of liability, and the Court has already held that Mitchell stated a promissory estoppel claim based on promises including the alleged oral promises at issue here. (*See* Op., Doc. 18, #216–17). Moreover, the relevant claim in *Weiper* was for postemployment commissions. *See Weiper*, 661 N.E.2d at 802. In this case, by contrast, Mitchell alleges that Fujitec failed to pay him promised

compensation (a bonus for 2019 and salary increase for 2020) during periods of time prior to Mitchell's termination, while he was still working for Fujitec. (*See* Am. Compl., Doc. 19, #251).

Accordingly, the Court **DISMISSES WITH PREJUDICE** Count V of Mitchell's Amended Complaint (Doc. 19) insofar as it relies on Fujitec's policies regarding discrimination and investigation of claims of sexual harassment. But the Court **DENIES** the Fujitec Defendants' Motion (Doc. 21) with respect to the alleged oral promises of a bonus and salary increase.

## E.   Mitchell Fails To State A Claim For Intentional Infliction of Emotional Distress (Count XI).

Under Ohio law, a "claim for intentional infliction of emotional distress requires proof of the following elements: '(1) the defendant either intended to cause, or knew or should have known, that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure it.'" *Walters v. Carter*, No. 108555, 2020 WL 1066063, at \*7–8 (Ohio Ct. App. Mar. 5, 2020) (quoting *Ashcroft v. Mt. Sinai Med. Ctr.*, 588 N.E.2d 280, 284 (Ohio Ct. App. 1990)). The Court's previous Opinion (Doc. 18, #221–23) found that Mitchell's allegations in his original Complaint (Doc. 1) failed to satisfy the outrageousness element.

21

"Extreme and outrageous" is a high bar. "Conduct giving rise to an IIED claim must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Kovac v. Superior Dairy, Inc.*, 930 F. Supp. 2d 857, 870 (N.D. Ohio 2013) (citing *Long v. Ford Motor Co.*, 193 Fed. App'x 497, 503 (6th Cir. 2006)). And the bar is, if anything, even higher in the employment context. *Culler v. Exal Corp.*, 193 F. Supp. 3d 850, 852–53 (N.D. Ohio 2016) ("Ohio places a particularly high bar on 'extreme and outrageous' conduct in the employer-employee relationship."). Moreover, the question of whether conduct is "extreme and outrageous" is a matter of law for the Court. *Mender v. Chauncey*, 41 N.E.3d 1289, 1299 (Ohio Ct. App. 2015). That means a ruling "in defendant's favor is warranted when the conduct is not, as a matter of law, 'extreme and outrageous.'" *Id.* at 1299–30.

Importantly, at least one Ohio court has held as a matter of law that "falsely accusing [the plaintiff] of engaging in sexual harassment and violating" the company's policies is not extreme or outrageous conduct. *Adkins v. DuPont Vespel Parts & Shapes, Inc.*, No. 88352, 2007 WL 1643208, at *2 (Ohio Ct. App. June 7, 2007); *see also Wolfe v. Thermo Fisher Scientific, Inc.*, No. 2:08-cv-933, 2009 WL 1255023, at *2 (S.D. Ohio May 4, 2009) (allegations of failure to investigate false charges of sexual harassment and inappropriate remarks at company event insufficient to state claim for intentional infliction of emotional distress). Given the

high bar for showing extreme and outrageous conduct, that seems a correct statement of Ohio law.

Viewed under these demanding legal standards, Mitchell's Amended Complaint (Doc. 19, #257–59) still misses the mark. By comparison with his original Complaint (Doc. 1), whose allegations did not meet the legal standard for outrageousness under Ohio law, Mitchell has not alleged any new facts that would help him clear that bar this time around. Instead, Mitchell cites to a case, *Mango v. City of Columbus*, 2:19-cv-5282, 2020 WL 5247939, at *18 (S.D. Ohio Sept. 3, 2020), that he says supports his argument that the conduct he had previously alleged is extreme and outrageous. But *Mango*, where the plaintiff accused the defendant of falsely accusing her of abusing her children in order to take away her visitation rights, was not in the employment context, and has no apparent factual similarities with this case. *See id.* Perhaps unsurprisingly, then, Mitchell's briefing offers no explanation of how *Mango* supports Mitchell's claims here. (*See* Opp'n, Doc. 23, #343).

Also without further explanation, Mitchell cites *Smith v. GE Aviation*, No. 3:10-cv-013, 2011 WL 4914964, at *4 (S.D. Ohio Aug. 31, 2011). (*See* Opp'n, Doc. 23, #342). Although *Smith* was at least in the employment context, its central allegation, that the defendants misused a psychiatric evaluation as an opportunity to exhaust and humiliate the plaintiff by interrogating her for hours about her sexual relationships, is otherwise completely inapposite to this case. *See Smith*, 2011 WL 4914964, at *4.

In short, Mitchell has not alleged outrageous conduct sufficient to support an intentional infliction of emotional distress claim. The Court thus **DISMISSES** Count XI of Mitchell's Amended Complaint (Doc. 19) **WITH PREJUDICE**.

## F.  Mitchell States Breach Of Contract And Promissory Estoppel Claims Against Fujitec Co.

The Fujitec Defendants argue that the Court must dismiss all claims against Fujitec Co. based on the Japanese parent company's corporate separateness from the American subsidiary. (*See* Mot., Doc. 21, #306; *see also* Reply in Supp. of Mot. ("Reply"), Doc. 26, #360–61). But given the disposition of Mitchell's other claims above and in the Court's previous Opinion (Doc. 18), the Court need only consider the corporate separateness argument as it pertains to Mitchell's claims for breach of contract (with the limitations discussed above), promissory estoppel, discrimination, and retaliation.[3]

The Fujitec Defendants frame the issue as a matter of veil-piercing. (*See* Mot., Doc. 21, #306). But Mitchell says differently, arguing that Fujitec Co. is directly liable because of its own role in the various events that give rise to Mitchell's claims, rather than vicariously liable on a veil-piercing theory. (*See* Opp'n, Doc. 23, #337–38). Accordingly, the Fujitec Defendants' veil-piercing arguments are largely beside the point. At this early stage, Mitchell has plausibly alleged that Fujitec Co. is directly liable on his breach of contract and promissory estoppel claims by alleging that "Defendants," which includes Fujitec Co., made the promises at issue. (*See* Am.

---

[3] The Court has already dismissed with prejudice the defamation claim against Fujitec Co. (*See* Op., Doc. 18, #210).

Compl., Doc. 19, #249–52). For example, it is a plausible inference from Mitchell's Amended Complaint (Doc. 19) that Fujitec Co. was involved in Fujitec America's decision to include particular policies in its employee handbooks. (*See id.*). It is also a plausible inference that Fujitec Co. was involved in the decision to promise a high-level employee of Fujitec America a substantial annual bonus and salary increase on an ongoing basis. (*See id.*). Mitchell might ultimately be unable to prove any of this, such that summary judgment for Fujitec Co. would be appropriate, but that is a question for another day. Accordingly, the Court **DENIES** the Fujitec Defendants' Motion (Doc. 19) with respect to the breach of contract and promissory estoppel claims against Fujitec Co.

## G.  Mitchell States Claims For Discrimination And Retaliation Against Fujitec Co. Under Both Federal And Ohio Law.[4]

The analysis is similar with respect to Mitchell's federal and state law discrimination and retaliation claims against Fujitec Co. The Fujitec Defendants argue that Fujitec Co. cannot be held liable on a veil-piercing theory. (*See* Mot., Doc. 21, #306). But veil-piercing is not the relevant inquiry for Title VII purposes (and

---

[4] In its previous Opinion (Doc. 18), the Court dismissed the state law discrimination claim against McKenzie without prejudice, because under Title VII, Ohio law allows an employment discrimination suit against any individual who engages in discriminatory conduct. (*Id.* at #220). Mitchell's Amended Complaint (Doc. 19) does not add any allegations that McKenzie's allegedly false accusation that Mitchell sexually harassed her was due to racial animus. (*See* Op., Doc. 18, #220). Instead, the Amended Complaint (Doc. 19) attributes a different motive for McKenzie's allegedly false sexual harassment allegations, namely McKenzie's alleged desire to "shield herself from … termination for poor job performance." (*See id.* at #237). Thus, the Court interprets Mitchell's Amended Complaint (Doc. 19) not to pursue a state law claim for discrimination against McKenzie. For avoidance of confusion, the Court **DISMISSES WITH PREJUDICE** any remaining discrimination claim against McKenzie under Ohio law.

thus for purposes of Mitchell's discrimination and retaliation claims under Ohio state law as well). *See Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir. 1983) (abrogated on other grounds by *Arbaugh v. Y&H Corp.*, 456 U.S. 500 (2006)) (adopting four criteria for determining "single employer" status for Title VII purposes); *see also Wittenbrook v. Elecs. Recycling Servs., Inc.*, 104 N.E.3d 876, 882–83 (Ohio Ct. App. Jan. 8, 2018) (citing *Armbruster*, 711 F.2d at 1337, as four-factor test for joint employer status for discrimination claim under Ohio state law). Instead, the Sixth Circuit's four-factor test for single-employer status under Title VII requires courts to consider "(1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *See Armbruster*, 711 F.2d at 1337–38. No single factor is dispositive, and not all need be present to support a finding of joint employer status. *Id.* "The most important requirement is that there be sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer." *Id.* at 1337.

Here, Mitchell alleges that the president and CEO of Fujitec Co. participated in Fujitec America's corporate meetings, that the two entities are a single business enterprise, that Fujitec America is a wholly owned subsidiary of Fujitec Co., that Fujitec Co. participates in Fujitec America's business decisions, and that Krupp told Mitchell that "direction" from Fujitec Co. was influencing the handling of the disciplinary action against Mitchell in particular. (*See* Am. Compl., Doc. 19, #226–27,

238). These allegations suffice at the motion to dismiss stage to allege that Fujitec Co. was Mitchell's joint employer. Especially given Mitchell's position within Fujitec, Mitchell's Amended Complaint (Doc. 19) gives rise to a plausible inference that Fujitec Co. was "jointly responsible" for the acts leading to and including Mitchell's termination. *See Armbruster*, 711 F.2d at 1337. If record evidence fails to substantiate Fujitec Co.'s involvement, then summary judgment may be appropriate. But for now, the Court **DENIES** the Fujitec Defendants' Motion (Doc. 21) insofar as it seeks dismissal of the discrimination and retaliation claims against Fujitec Co.

## CONCLUSION

Based on the above, the Court **GRANTS IN PART** and **DENIES IN PART** the Fujitec Defendants' Motion to Dismiss (Doc. 21). Specifically, the Court **GRANTS** the Motion (Doc. 21) with respect to Counts I, III, IV, and XI of Mitchell's Amended Complaint (Doc. 19), as well as Count V insofar as it concerns Fujitec's policies regarding discrimination and investigation of sexual harassment allegations, and thereby **DISMISSES** those claims **WITH PREJUDICE**. The Court **DENIES** the Motion (Doc. 21) in all other respects. The case shall proceed as to Count II against all Defendants other than Fujitec Co., Count V against Defendants Fujitec America and Fujitec Co., but only insofar as it concerns alleged oral promises of compensation, Count VI against all Defendants other than McKenzie, Counts VII and VIII against Fujitec America and Fujitec Co., and Counts IX and X against the Fujitec Defendants.

**SO ORDERED.**

March 21, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**