# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DARRYL MITCHELL,  ::

    *Plaintiff,*  ::  Case No. 1:20-cv-363

v.  ::  Judge Jeffery P. Hopkins

FUJITEC AMERICA, INC., *et al.*,  ::

    *Defendants.*  ::

---

## OPINION AND ORDER

---

Sometimes, non-discrimination obligations are in conflict: in seeking to comply with one command of anti-discrimination law, a company brings itself into jeopardy of suit for allegedly failing to comply with another command. According to defendants in this action, this is such a case. Fujitec America, Inc. is an elevator manufacturing, installation, and service company headquartered in Mason, Ohio. Doc. 90-1, ¶ 1. It is a wholly owned subsidiary of Fujitec Co., Ltd., a Japanese company. *Id.* ¶ 2. Defendant Fujitec America ("Fujitec")[1] terminated Plaintiff Darryl Mitchell after another Fujitec employee, Shawnez McKenzie, made a sexual harassment complaint against him. Mitchell maintains that the complaint was false, and further, that Fujitec would only have terminated him for it if they were discriminating against him because of his race. Shortly after his termination, Mitchell filed the instant lawsuit, bringing race discrimination claims, contract-related claims, and tort claims against Fujitec, its parent company, Fujitec Co., Ltd., its President, Gary Krupp, and

---

[1] All references to "Fujitec" are to Fujitec America, not its Japanese parent company, unless otherwise noted.

McKenzie. After motions to dismiss, a narrower set of claims proceeded to discovery: discrimination, defamation and contract-related claims against the Fujitec Defendants and Krupp, and a defamation claim against McKenzie.

The matter is now before the Court on Defendants' Motions for Summary Judgment: one Motion filed by the Fujitec Defendants and Krupp (Doc. 90) and a separate Motion filed by McKenzie (Doc. 91).

For the reasons that follow, the Motion filed by the Fujitec Defendants and Krupp (Doc. 90) will be **GRANTED**. McKenzie's Motion (Doc. 91) will be **DENIED**.

## I. BACKGROUND

Plaintiff Darryl Mitchell, who is African American, joined Fujitec in 2012, at age 49, as its Chief Legal Counsel. Doc. 90-1, ¶ 12. *See* Mitchell Dep., Doc. 72, 13:3–4, 140:21–24. Prior to joining Fujitec, Mitchell had worked as in-house counsel for other corporations. Earlier in his career, he worked at GE, negotiating service agreements for aircraft engines. *Id.* at 59:10–15. When his next employer, GE IT Solutions, merged with Dallas-based information technology company CompuCom, he moved to that company, also in their legal department. *Id.* at 56:21–57:3. Immediately before Fujitec, he worked at Harsco, an industrial company, reporting to its general counsel. *Id.* at 51:19–22.

Mitchell was hired by Fujitec in 2012 as Chief Legal Counsel, and not long afterwards, his title was changed to Chief Legal Officer. *Id.* at 87:17–22. Thereafter, he received a regular raise in each year except 2020, the year he was terminated. *See* Doc. 90-1, ¶¶ 21–26. As Chief Legal Officer, Mitchell's responsibilities were wide-ranging: he had certain responsibilities as a member of Fujitec's leadership team, including reporting corporate minutes; he oversaw Fujitec's contracting; he oversaw the company's safety and compliance activities; he

negotiated the company's benefits plans; he handled more typical legal responsibilities, such as overseeing its litigation activity; and after the company's former human resources director left, he also oversaw human resources for the company. Mitchell Dep., Doc. 72, 89:11–90:22. While there were other Fujitec employees in each of these areas—legal, HR, safety— Mitchell's position was unique in that no other employee had the same combination of responsibilities. *Id.* at 91:11–18.

Mitchell's human resources responsibilities meant he was responsible for responding to complaints of sexual harassment at Fujitec. In Spring of 2018, he fielded an informal complaint of sexual harassment from a female employee, a codefendant in these proceedings, Shawnez McKenzie, who worked in Fujitec's Finance Department at the company's Mason office, and someone he considered a friend at that time. *See* Doc. 98-1, ¶¶ 53–56. Defendant McKenzie told Mitchell that Ray Gibson, Fujitec's Chief Financial Officer and her ultimate supervisor, was acting in ways she considered inappropriate. *See id.* ¶ 53. In that same conversation, McKenzie told Mitchell that Gibson would "hit on" her and comment on her appearance. Doc. 90-1, ¶ 54; Doc. 91-1, ¶ 14. Mitchell asked her if she wanted to file a sexual harassment claim, but she declined. Doc. 98-1, ¶ 55. McKenzie raised a similar issue with Mitchell later that year, complaining to Mitchell that Gibson asked her to send him a picture of herself after she showed him pictures from a vacation where she was in a bikini. *See* Doc. 91-1, ¶ 17. (As it turns out, this conversation between McKenzie and Gibson occurred in 2013, roughly five years before her more recent complaints to Mitchell. *See* McKenzie Dep., Doc. 76, 141:13–142:15.) Mitchell asked McKenzie if she wanted to file a claim, and she again declined. As a further precaution, Mitchell told McKenzie not to show Gibson any more pictures. Doc. 91-1, ¶ 18; Doc. 94-1, ¶ 18.

Subsequently, in early 2019, McKenzie told Mitchell that she had been the recipient of another unwanted advance by Gibson. As Mitchell recalls this report, McKenzie walked into his office, pulled a piece of paper out of her bra and set it on his desk. The paper was a written invitation to a swinger's club in Middletown, Ohio—she told Mitchell that Gibson gave her the invitation. Mitchell Dep., Doc. 72, 305:6–15; Doc. 91-1, ¶¶ 21–22; Doc. 94-1, ¶¶ 21–22. Mitchell responded that he thought it was appropriate to take disciplinary action against Gibson, but McKenzie again told him that she did not want to make a complaint, this time noting that it was because she feared retaliation. Doc. 91-1, ¶ 25; Doc. 94-1, ¶ 25. Mitchell and McKenzie then had an exchange regarding the filing of a complaint. Mitchell asked McKenzie to give him the flier so he could write up a complaint and McKenzie initially refused, but after speaking with an attorney friend on the phone, McKenzie later handed the flier to Mitchell. Mitchell Dep., Doc. 72, 306:14–307:9. Almost immediately, Mitchell wrote an email to Gary Krupp, the president of Fujitec America, regarding the incident. In that email, he mentioned the swinger's club flier as well as Gibson's previous unsolicited advances towards McKenzie. Mitchell Dep. Ex. 10, Doc. 72, PageID 795–96. Mitchell recommended immediate action:

> Obviously, the situation can erupt into a devastatingly high risk/ high dollar matter for us should she choose to file a claim. . . . I get the sense that he's been chasing her for a long time, leading to a very difficult work environment for her. . . She feels intimidated, trapped and concerned that once her name surfaces as the genesis of an investigation, his treatment of her will worsen. . . . I would recommend taking action as soon as possible.  Delay can result in significant costs to the company, and potential loss of necessary employees.

*Id.*

After Krupp and Mitchell spoke about the incident, they recommended to higher-ups at Fujitec that Gibson be terminated. Mitchell Dep. Ex. 10, Doc. 72, PageID 800. At no point prior to settling on that recommendation did Mitchell interview Gibson regarding

4

McKenzie's allegations. Doc. 90-1, ¶ 71; Doc. 98-1, ¶ 71. After getting approval to terminate Gibson, Mitchell planned for his departure and assisted Krupp in carrying out his termination. Mitchell Dep. Ex. 10, Doc. 72, PageID 799–800.

At this point, the story takes a somewhat strange turn. McKenzie was unhappy about Mitchell reporting Gibson's purported harassment and unhappy about Gibson's termination. *See* McKenzie Dep., Doc. 76, 126:7–23. This was, at least in part, because she feared backlash from other employees in the company. *Id.* at 126:10–11. But she also had other objections. Notably, McKenzie thought it was hypocritical for Mitchell to report Gibson because he— Mitchell—had also been making sexual advances toward her. *Id.* at 126:21–23 ("Again, I did not want [Gibson to be reported]. Darryl [Mitchell]. . . was doing the same thing. It didn't make sense."). Until that point, Mitchell and McKenzie had been cordial, but after Gibson was terminated, McKenzie was no longer friendly with Mitchell. *Id.* at 172:6–9 ("[W]hat [Mitchell] did with Ray [Gibson] with the sexual harassment and [Mitchell] was doing it too, the pot calling the kettle black, and I stopped talking to [Mitchell].").[2] In March 2019, Mitchell had a 30-minute phone call with McKenzie. According to McKenzie, she relayed to Mitchell that she thought his complaint against Gibson was hypocritical, and Mitchell responded by stating that his actions could not be sexual harassment because he was not McKenzie's supervisor. *See* Doc. 90-1, ¶¶ 103–04.

Next, according to McKenzie, because of the perceived injustice of what happened to Gibson, she was eventually motivated to report Mitchell for *his* purported sexual harassment of her, which mostly took place between 2015 and 2017. On January 7, 2020, McKenzie came

---

[2] When McKenzie was shown Mitchell's email reporting Gibson during her deposition, she also objected that Mitchell mischaracterized and exaggerated her allegations. McKenzie Dep., Doc. 76, 127:23–128:10.

to Krupp's office and, with Fujitec Controller Daiji Yoshimura present, raised several concerns about Mitchell's behavior. Doc. 90-1, ¶¶ 75–78. These included allegations that Mitchell had repeatedly propositioned her to engage in a romantic relationship between 2015 and 2018, had asked her to be his "mistress," and once grabbed her waist in the breakroom and rubbed against her backside. Doc. 90-1, ¶¶ 79–80. In response, Krupp emailed McKenzie to notify her that Fujitec would be investigating her allegations. Krupp also consulted with Elizabeth Bulat, an Atlanta employment attorney with whom he had worked previously. *Id.* ¶¶ 84–85; Doc. 75, PageID 955–56.

Very shortly thereafter, Bulat began an investigation into Mitchell's conduct. On January 13, Bulat traveled to Ohio and began interviewing the involved parties. Bulat spoke with Krupp and Yoshimura, then interviewed Mitchell, McKenzie, and two attorneys at Fujitec who reported to Mitchell. Doc. 90-1, ¶¶ 96–98. That evening, Bulat wrote an email to Krupp summarizing her findings. In that email, she recounted several specific allegations McKenzie made:

- In or around 2015, and continuing through 2017, Darryl [Mitchell] repeatedly propositioned [Shawnez McKenzie] to have a romantic and sexual relationship;
- Darryl specifically asked Shawnez to be his "mistress" and to have an "affair" with her;
- Darryl asked Shawnez if he was "attractive" to her;
- Darryl repeatedly asked Shawnez if he could go over to her house; and
- On one occasion in the company break room, Darryl came up behind her, grabbed her waist with both hands, and rubbed his pelvic area against her backside.

Doc. 75, PageID 960.

Bulat also relayed the findings from her interview with Mitchell, which she reported largely corroborated McKenzie's version of events. Specifically, Bulat relayed that Mitchell admitted to having a "flirtatious" relationship with McKenzie and admitted that some of her

allegations were factually accurate but mischaracterized. Doc. 75, PageID 961. For example, Bulat reported that Mitchell admitted to asking to come over to McKenzie's house but "explained he just wanted to see her new decorating since he was interested in real estate." *Id.* at PageID 961. Mitchell further admitted that he and McKenzie "texted and spoke with each other often, despite the fact that they had no work-related reason to do so." *Id.* In addition to concerns regarding Mitchell's behavior with McKenzie, Bulat raised concerns regarding his failure to escalate complaints about Gibson, writing, "Darryl [Mitchell] could have prevented Ray [Gibson]'s inappropriate treatment of Shawnez [McKenzie], but he failed to do so." *Id.*[3]

Krupp replied early the next morning: "Perfect!" *Id.* at PageID 960. That same day, Krupp met with Mitchell and informed him that he was being placed on administrative leave while the company evaluated how to respond to McKenzie's report. Doc. 90-1, ¶ 133. Three days later, Fujitec was the victim of a cyberattack, which limited employees' access to the company's computer network; as Krupp tells it, this limited his ability to communicate with Mitchell about his suspension. *Id.* ¶¶ 135–39. The cyberattack did not, however, appear to delay Krupp in acting on Bulat's recommendation. On February 3, 2020, Krupp emailed Takakuzu Uchiyama, the president of Fujitec Co. Ltd., in Japan, and told him that he planned to terminate Mitchell. *Id.* ¶ 141. Uchiyama agreed, and two days later, on February 5, 2020, Krupp emailed Mitchell to say he was being terminated effective immediately. *Id.* ¶ 144. Mitchell appealed his termination on February 18, 2020. *Id.* ¶ 149. Krupp responded on

---

[3] Mitchell does not, for the most part, dispute the factual accuracy of Bulat's recounting of what he said in their interview, but he believes she mischaracterized some of his statements. For example, Mitchell rejects Bulat's statement that there was no work-related reason for Mitchell and McKenzie to be texting, but he admits that the two did exchange non-work-related text messages. Mitchell Dep., Doc. 72, 135:13–136:4.

March 11, 2020, saying he was denying Mitchell's appeal. *Id.* ¶ 155. Krupp's response included further explanation of his rationale for Mitchell's termination, noting that Mitchell was terminated both for "inappropriate romantic solicitations of Shawnez McKenzie and for failing to investigate or otherwise address evidence of potential harassment of Ms. McKenzie by her supervisor, former CFO Ray Gibson." Mitchell Dep. Ex. 15, Doc. 72, PageID 815. The letter noted that McKenzie's complaint was "partially substantiated" as Mitchell had admitted to various non-work interactions with McKenzie. *Id.* It went on to say that Mitchell's interactions with McKenzie were "inconsistent with our policies and the expectations we have of an executive officer of Fujitec," whether McKenzie reported directly to him or not. *Id.* As to his failure to address Gibson's actions, Krupp wrote that it was "your obligation as head of HR to address Ms. McKenzie's report to you that her boss was hitting on her," whether she wanted to report those incidents or not. *Id.* at PageID 816.[4] So ended Mitchell's tenure as Fujitec's Chief Legal Officer.[5]

Also relevant, Krupp had recently become the President of Fujitec America when the above actions took place. There were growing pains for him in managing the organization, with some at the company questioning his leadership. Smith Dep., Doc. 74, 34:19–35:2. In January 2019, shortly after Krupp became President, one employee, Joe Rennekamp, asked for a title change and pay raise. Krupp Dep., Doc. 87, 302:18–22. As Krupp recalls, several employees asked for raises. *Id.* at 305:6–8 ("When I first started [as President] . . . I was deluged with people wanting more money and things."). In the Fall of 2019, Mitchell was

---

[4]  The letter also noted that Fujitec had discovered various other instances of malfeasance after placing Mitchell on leave, including using company time and resources for non-company matters, and making unwise decisions about retention of counsel. Mitchell Dep. Ex. 15, Doc. 72, PageID 816.

[5]  In August 2020, McKenzie left the company too. *See* McKenzie Dep., Doc. 76, 18:16–18.

among those employees who had approached Krupp and asked for a pay raise. Doc. 90-1, ¶ 44; Doc. 98-1, ¶ 44. Mitchell had learned that Joe Smith, an Executive Vice President at the company, received a pay raise and believed he was entitled to one as well. As Mitchell remembers the conversation, he explained to Krupp the cost savings he was securing for the company and argued that his pay was not commensurate with his responsibilities in the organization. Mitchell Dep., Doc. 72, 119:6–14. Mitchell told Krupp he felt he was underpaid, however he did not during that conversation raise concerns about race discrimination, or mention race at all. *Id.* at 120:9–12.

On May 7, 2020, Mitchell filed the instant action. Compl., Doc. 1.

## II.    STANDARD OF REVIEW

The Fujitec Defendants and Krupp seek summary judgment in their favor on all of Mitchell's claims. Doc. 90. McKenzie separately seeks summary judgment on Mitchell's only claim against her that survived dismissal at the motion-to-dismiss stage, for defamation. Doc. 91. As the moving parties seeking summary judgment, Defendants "'bear[] the initial responsibility of informing the district court of the basis for [their] motion[s], and identifying the portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). On the other hand, the non-moving party cannot defeat a motion for summary judgment merely by showing the existence of some factual dispute. Rather, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby,*

9

*Inc.*, 477 U.S. 242, 247–48 (1986)). In the end, the Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (quoting *Anderson*, 477 U.S. at 251–52). In making this determination, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

### III.   LAW AND ANALYSIS

Because of possible confusion that can arise from the many claims brought initially by Mitchell, some of which were dismissed in two separate Orders, the Court will approach the analysis of the remaining claims in the case methodically. *See* Docs. 18, 28.[6] The Court will address first the Fujitec Defendants' Motion for Summary Judgment, and then McKenzie's Motion for Summary Judgment.

### A. Fujitec Defendants' Motion for Summary Judgment (Doc. 90)

Fujitec America, Fujitec Co. Ltd., and Mr. Krupp seek summary judgment in their favor on all remaining claims against them. Those are:

- Count II – Defamation against Fujitec America and Gary Krupp

- Count V – Breach of Implied Contract against Fujitec America[7]

- Count VI – Promissory Estoppel against Fujitec America, Fujitec Co. and Mr. Krupp

- Count VII – Title VII Race Discrimination against Fujitec America and Fujitec Co.

---

[6]   This matter was previously before the Honorable Douglas R. Cole and was transferred to the undersigned shortly after being appointed to this Court.

[7]   This claim survived Fujitec's Motion to Dismiss "only insofar as it concerns alleged oral promises of compensation." Doc. 98-1, ¶ 162.

- Count VIII – Title VII Retaliation against Fujitec America and Fujitec Co.

- Count IX – Race Discrimination in violation of Ohio Revised Code § 4112 against Fujitec America and Fujitec Co.

- Count X – Retaliation in violation of Ohio Revised Code § 4112 against Fujitec America and Fujitec Co.

### 1. Defamation Against Fujitec America and Gary Krupp

Fujitec America and Krupp seek summary judgment on Mitchell's defamation claims on the grounds that Mitchell has failed to identify any false, defamatory statement that Krupp or Fujitec made, and on the separate basis that even if Krupp told Fujitec employees about McKenzie's allegations against Mitchell and those allegations were false, Krupp is nonetheless not liable for defamation because he, meaning Krupp, was unaware the statements were false. Doc. 90, PageID 1836–37.

Mitchell responds that he has adduced deposition testimony from Joe Smith, a former Fujitec employee, that Krupp told another Fujitec employee, Lou Antonello, about the investigation of Mitchell. Doc. 98, PageID 2123. He further posits a sort of conspiracy or collusion, claiming Krupp "intentionally conspired with Bulat to slander Mitchell to Uchiyama to curry his support from Fujitec Co. for Mitchell's termination," *id.*, and he "may well have directed Bulat to fabricate or expand the claims and accusations against Mitchell to create a salacious narrative that would encourage Uchiyama to consent to Mitchell's termination." *Id.* at PageID 2124.

The Court agrees with Fujitec America and Krupp that even if Krupp relayed McKenzie's accusations to other Fujitec employees, Mitchell has not adduced facts that would allow a jury to conclude that Krupp or Fujitec defamed him. To prevail on his defamation claim under Ohio law, Mitchell must establish five elements: "(1) that a false

11

statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." *Fisher v. Ahmed*, 2020-Ohio-1196, ¶ 32 (9th Dist.) (quoting *Am. Chem. Soc'y v. Leadscope, Inc.*, 2012-Ohio-4193, ¶ 77). *See* Doc. 18, PageID 195. "To establish the requisite degree of fault, the plaintiff must show fault of at least negligence on the part of the defendant." *Fisher*, 2020-Ohio-1196, ¶ 32.[8]

Setting aside other possible problems with Mitchell's defamation claim against Krupp, he has failed to establish a genuine issue of fact as to whether Krupp acted with the "requisite degree of fault" in purportedly relaying McKenzie's accusations to other Fujitec employees. Instead, the record reflects that any statements he made regarding McKenzie's allegations were based on his conversations with McKenzie and the investigation Bulat conducted following McKenzie's revelation of Mitchell's alleged unwanted advances. Assuming (1) that Krupp relayed McKenzie's specific allegations—not just the mere fact that Mitchell was being investigated—to a limited subset of Fujitec employees, and (2) those allegations were false, Mitchell fails to raise a genuine issue of fact as to whether Krupp can be liable for defamation in relaying those allegations. Because Krupp relied on Bulat's report in disclosing information

---

[8] The Court exercises supplemental jurisdiction over Mitchell's state-law claims pursuant to 28 U.S.C. § 1367. Where the Court exercises supplemental jurisdiction over a plaintiff's state-law claims, it applies the choice-of-law rule of the forum state—here, Ohio—to determine the substantive law that applies to those claims. *Kendel v. Local-17-A UFCW*, 512 F.App'x 472, 478 (6th Cir. 2013). Ohio follows the Restatement of the Law of Conflicts, under which the substantive law to be applied is determined by "which state possesses the most significant relationship to the tort injury." *In re Bon Secours Mercy Health Data Breach Litig.*, 1:24-cv-594, 2025 WL 1827804, *8 (S.D. Ohio July 2, 2025) (citing *Morgan v. Biro Mfg. Co., Inc.*, 15 Ohio St. 3d 339, 341–42 (1984)).

about the investigation to a limited number of other Fujitec employees,[9] he did not act with the "requisite degree of fault," *id.*, to support a defamation claim.[10]

Mitchell points to no law to support his contention that the alleged statements are actionable; indeed, the relevant authority points in the opposite direction. *See Croce v. New York Times Co.*, 345 F.Supp.3d 961, 985 (S.D. Ohio Nov. 6, 2018) (rejecting argument that republisher of defamatory information is liable for the defamatory statement to same degree as the original publisher and describing state of current Ohio law: "the republisher of a defamatory statement made by another remains subject to liability . . . but he cannot be held liable unless he himself knew at the time when the statement was published that it was false, or acted in reckless disregard of its truth or falsity") (quoting *Catalano v. Pechous*, 83 Ill.2d 146, 168 (Ill. 1980)); *Blesedell v. Chillicothe Tel. Co.*, 811 F.3d 211, 225 (6th Cir. 2016) (holding there

---

[9] As the Court explained in its Order (Doc. 18) on the Fujitec Defendants' Motion to Dismiss, Krupp's communications with Fujitec employees are also subject to a "qualified privilege for intra-corporate communications," which is only lost if he knew his statements were false, or if the statements were not made "in a reasonable manner and for a proper purpose." *Mitchell v. Fujitec America, Inc.*, 518 F. Supp. 3d 1073, 1096 (S.D. Ohio Feb. 8, 2021) (*quoting Bisbee v. Cuyahoga County Bd. of Elections*, No. 77629, 2001 WL 204174, *5 (Ohio Ct. App. 2001)); *see* Doc. 18. Here, the Court need not determine if Krupp's statements were subject to the qualified privilege. There is no genuine issue of fact as to whether Krupp acted with requisite degree of fault to support a defamation claim, so he is not liable for defamation—whether or not his statements were subject to the qualified privilege.

[10] Plaintiff Mitchell can point to no admissible record evidence that Krupp specifically averred that Mitchell harassed McKenzie. The evidence he does point to regarding Krupp's statement—secondhand testimony from Joe Smith that he heard Mitchell was under investigation—is inadmissible hearsay. *See* Smith Dep., Doc. 74, 50:23–51:4 ("Q[.] Can you tell us what it is that Louis and Chris told you about what Gary Krupp had to say about Mr. Mitchell being investigated? A[.] Just what -- there was obviously some type of investigation going on, and that he was -- I don't remember the specifics. He was -- Darryl was basically screwed."). At summary judgment, "hearsay must be disregarded." *M.J. v. Akron City Scho. Dist. Bd. of Educ.*, 1 F.4th 436, 447 (6th Cir. 2021) (citation and internal quotation marks omitted).

Even if it was admissible, Smith only testified that Krupp relayed McKenzie's accusations, not that Krupp affirmatively stated that Mitchell harassed McKenzie. Smith Dep., Doc. 84, 50:23–51:4.

was no viable defamation claim under Ohio law when the defendant "truthfully reported that an individual made an allegation about [plaintiff]").

Mitchell's allegation that Krupp failed to follow Fujitec confidentiality policy, Doc. 98, PageID 2122, is unavailing because such a policy does not alter the elements of a defamation claim under Ohio law. As to the purported conspiracy with Bulat to fabricate a sexual harassment claim against Mitchell, Mitchell has not adduced evidence that would allow a factfinder to conclude such a conspiracy took place.

Finally, as to Mitchell's defamation claim against Fujitec America, he has not identified any allegedly defamatory statement that he seeks to attribute to the corporation apart from Krupp's statement discussed above. *See* Am. Compl., Doc. 19, ¶¶ 102–03. For the reasons already provided, Krupp's statement, even if attributable to Fujitec, is not actionable under Ohio law.

## 2. Breach of Implied Contract Against Fujitec America

The Fujitec Defendants seek summary judgment on Mitchell's remaining breach of implied contract claims.[11] In these claims, he asserts that Fujitec violated its promises to: (1) increase his salary in 2020, and (2) pay him his discretionary bonus for 2019. Fujitec argues that because of when salary increases were put into effect and bonuses paid in 2020, Fujitec had no contractual obligation, either express or implied, to make these payments to Mitchell. Doc. 90, PageID 1839–41. The Court agrees.

---

[11] The parties agree that Ohio law applies to Mitchell's quasi-contract claims, *see* Docs. 90, 98 (applying Ohio law to breach of implied contract and promissory estoppel claims). Moreover, there is nothing in the record suggesting that the Court should apply another state's law.

<u>Salary Increase</u>

To prevail on a claim for breach of implied contract, Mitchell must establish a "meeting of the minds [] shown by the surrounding circumstances" such that "the contract exists as a matter of *tacit* understanding." *Mitchell v. Fujitec America, Inc.*, 1:20-cv-363, 2022 WL 836424, *8 (S.D. Ohio Mar. 21, 2022) (quoting *Dunn v. Bruzzese*, 2007-Ohio-3500, ¶ 28 (7th Dist.)); *see* Doc. 28.

As to the salary increase, Fujitec notes that Fujitec employees were given raises "on or about February 21, 2020," after Mitchell was terminated, so there is no evidence to show that Mitchell did not receive a raise he earned. Doc. 90, PageID 1840. Instead, he simply did not last long enough at Fujitec to receive his 2020 raise. *Id.* Mitchell responds that some employees did receive raises prior to his departure on February 21, 2020. For example, Joe Smith, Fujitec's Executive Vice President, received a raise on January 1, 2020. Doc. 97, PageID 2065.

Mitchell fails to raise a genuine issue of fact as to whether there existed a "meeting of the minds" between himself and Fujitec and that he would receive a raise in January 2020. Instead, Mitchell testified he was told he would receive raises "based on the performance of the company." Mitchell Dep., Doc. 72, 215:15–19. Further, Mitchell testified to no promise made as to when pay raises would go into effect, and his employment records reflect that while raises frequently went into effect on January 1, they did not invariably go into effect at that time; in 2015, by way of example, Mitchell's raise did not go into effect until June of that year. *See* Mitchell Dep. Ex. 9, Doc. 72, PageID 790. Finally, despite the example Mitchell points to of a 2020 raise put in place on January 1, 2020, it is uncontested that "[r]aises for

*most* Fujitec employees were not communicated and put in place until February 21, 2020," after Mitchell's termination. Doc. 90-1, ¶ 148; Doc. 98-1, ¶ 148 (emphasis added).

Under the circumstance, there is no genuine issue of material fact—in short, a sufficient disagreement on the facts such that it would require submission of this question to a jury—whether there existed an implied agreement between Mitchell and Fujitec that he would receive a salary increase on or about January 1, 2020, or at any time prior to his departure.[12]

### 2019 Bonus

A similar analysis applies to Mitchell's claim regarding his 2019 bonus. Fujitec generally did not pay out bonuses to individuals after those individuals were terminated, as Mitchell acknowledged in his deposition. Mitchell Dep., Doc. 72, 217:11–14. Fujitec paid out bonuses for the 2019 performance year on February 21, 2020. *See* Doc. 90-1, ¶ 146; Doc. 98-1, ¶ 146. The record thus reflects that Fujitec followed normal company policy and practice in not paying Mitchell's bonus following his termination.

Further, Mitchell has adduced no evidence of the existence of a "tacit understanding," *Dunn*, 2007-Ohio-3500, ¶ 28 (citation omitted), between him and Fujitec that his bonus would be paid earlier than all other employees' bonuses were paid in 2020. And when those bonuses were paid, as noted above, he was no longer entitled to a bonus because of his separation from the company. Mitchell thus fails to raise a genuine issue of fact as to the existence of an obligation on Fujitec's part to pay him his 2019 performance bonus.

---

[12]  It is notable, in this connection, that Mitchell's race discrimination claim is based on his requesting a raise in late 2019 and Krupp saying something to the effect of, "there's nothing I can do," thus *not promising* to give Mitchell the raise he requested. *See* Doc. 98-1, ¶ 48.

### 3. Promissory Estoppel Against Fujitec Defendants and Krupp

Defendants also seek summary judgment on Mitchell's claims for promissory estoppel, contending that he has failed to show a genuine issue of fact as to the existence of some of the promises alleged, and has otherwise failed to show a genuine issue of fact as to detrimental reliance. Doc. 90, PageID 1841–46. The Court agrees that Defendants are entitled to judgment on this claim.

As stated in the Court's Order on the Fujitec Defendants' Motion to Dismiss, the elements of promissory estoppel are: "(1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise." *Mitchell v. Fujitec America, Inc.*, 518 F.Supp.3d 1073, 1099 (S.D. Ohio Feb. 8, 2021) (quoting *Jelinek v. Abbott Labs.*, No. 01AP-217, 2001 WL 1045534, at *4 (Ohio Ct. App. Sept. 13, 2001)); *see* Doc. 18.

Mitchell alleges six specific promises made by the Fujitec Defendants that he relied on to his detriment: (1) that Defendants' investigation of him would be "unbiased and thorough," (2) that Defendants would "communicate the status and factual findings of the investigation" to him, (3) that he would "have the opportunity to defend himself in an investigation against him, including the right to appeal the factual findings of the investigation," (4) that the investigation of him and any facts uncovered in it would be kept confidential, (5) that he would "receive an annual bonus of 17.5% of his then base pay," and (6) that he would "receive his usual and customary annual pay increase of approximately 5% of his then base pay." Doc. 19, PageID 252. At the motion-to-dismiss stage, the Court concluded these alleged promises

17

were "sufficiently specific . . . to support a claim for promissory estoppel." Doc. 18, PageID 216.

Beginning with alleged promises (5) and (6), these claims fail for the reasons explained above with respect to Mitchell's breach-of-contract claim. Notably, "[a] promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the employment-at-will doctrine." *Jelinek*, 2001 WL 1045534 at *4. For this reason, Mitchell failed to raise a genuine issue of fact as to whether he was promised he would receive the compensation at issue *in 2020*. At best, he established the existence of a promise by Fujitec to give him a raise and bonus in 2020 when raises were implemented and bonuses paid company-wide that year. But, as has been noted, raises were implemented and bonuses were paid after Mitchell was terminated, which meant that he was no longer entitled to either form of compensation. Accordingly, Mitchell has failed to establish a "clear, unambiguous promise," *Jelinek*, 2001 WL 1045534, at *4, that he would receive a raise and bonus in 2020.

Promises (1) through (4), related to Fujitec's investigation of McKenzie's sexual harassment claims against him, also fail because Mitchell has not raised a genuine issue of fact as to the existence of a clear, unambiguous promise. As to the existence of the promises, Mitchell points to Fujitec's Personnel Policy for investigating allegations of sexual harassment. *See* Doc. 98, PageID 2106–07; Mitchell Dep. Ex. 7, Doc. 72, PageID 782–83. But as the Court previously noted in its earlier Order (Doc. 28) on the Fujitec Defendants' Motion to Dismiss, these policies include no "clear promissory language," *Mitchell v. Fujitec America, Inc.*, No. 1:20-cv-363, 2022 WL 836424, *8 (S.D. Ohio Mar. 21, 2022), such that they would create an enforceable obligation on the part of Fujitec to take any particular action.

Mitchell's promissory estoppel claims survived Fujitec's Motion to Dismiss because he nonetheless asserted, in his complaint, the existence of specific promises made to him that any sexual harassment investigation of him would be conducted according to certain procedures. *See Mitchell*, 518 F. Supp. 3d at 1099–1100. Given these allegations, it was possible that there was support for the existence of separate promises that had been made to Mitchell outside the Personnel Policy itself. Mitchell has, however, adduced no such additional evidence. Instead, he continues to assert, in his Response to the Fujitec Defendants' Motion, that he "relied on the Fujitec Company Handbook and the Sexual Harassment Investigation policy to protect him against false accusations that could and did result in the loss of his employment." Doc. 98, PageID 2126. Accordingly, the Court must again conclude that the Personnel Policy was "a unilateral statement of rules and policies that creates no obligations or rights." Doc. 28, PageID 392 (quoting *Finsterwald-Maiden v. AAA S. Cent. Ohio*, 115 Ohio App. 3d 442, 446 (4th Dist. 1996)). The company handbook alone cannot support Mitchell's promissory estoppel claim.[13]

Additionally, Mitchell has failed to establish detrimental reliance on the Fujitec Personnel Policy for sexual harassment investigations. This case is not unlike *Porter v. Roosa*, 259 F. Supp. 2d 638 (S.D. Ohio Jan. 14, 2003). As noted in that case, "'[r]eliance' means more than merely expecting a certain result." *Id.* at 662. *Porter* involved a McDonald's manager who was terminated for allowing individuals into the restaurant where she worked

---

[13] The circumstances of this case also demonstrate that Fujitec's sexual harassment policy does not create an enforceable obligation to comply with its terms in all cases. The policy states that complaints will be "investigated by the Human Resources Department or someone assigned by the Human Resources Department," and makes other references to responsibilities of Fujitec's human resources office. Mitchell Dep. Ex. 7, Doc. 72, PageID 782–83. In this case, had that procedure been followed, Mitchell, as Fujitec America's Human Resources Director, would have directed the investigation of his own conduct. Doc. 90-1, ¶ 83; Doc. 98-1, ¶ 83.

after-hours. *Id.* at 645. She contended that her termination violated McDonald's company policy stating that employees would be treated fairly and consistently in disciplinary proceedings, because other managers "had engaged in similar conduct without ever having received discipline." *Id.* The Court concluded:

> [Plaintiff] was not actively "relying" on the Management Handbook policy of fair and consistent treatment *at the time she let the unauthorized individuals into the Stroop Road restaurant*. She merely "expected," in hindsight, once her violation was exposed, that she would not be disciplined (at least not terminated), because that was her impression of how McDonald's had treated other managers in the past in similar circumstances. There is a significant difference between active reliance in the first instance, and an ex post facto expectation, and this difference is what demarcates a viable claim for promissory estoppel from one that is not viable.

*Id.* at 662.

Here, similarly, Mitchell has alleged only an "ex post facto expectation," *Porter*, 259 F. Supp. 2d at 662, that certain actions would be taken by Fujitec in the course of investigating McKenzie's allegations against him. In addition, like the plaintiff in *Porter*, Mitchell only formed this ex post facto expectation based on "how [his employer] had treated other [employees] in the past in similar circumstances." *Id.* There was not nor could there have been any detrimental reliance by Mitchell, under Ohio law, on the Fujitec Personnel Policy for investigations of sexual harassment.[14]

Having failed to produce evidence that Mitchell relied to his detriment on any separate promises that his investigation would be handled in a certain manner apart from Fujitec's Personnel Policy, Mitchell has likewise failed to raise a genuine issue of fact material to his

---

[14] This case demonstrates a difference between "reliance" and "detrimental reliance." In the colloquial sense, Mitchell "relied" on his Fujitec colleagues to thoroughly investigate McKenzie's claim of sexual harassment. He needed them to do so in order to keep his job at Fujitec and had no other recourse at the company. But as explained above, the matter was out of Mitchell's hands at that time, and he took no detrimental action based on his belief that his Fujitec colleagues would investigate the matter thoroughly.

promissory estoppel claim. Accordingly, the Fujitec Defendants and Krupp are entitled to summary judgment on this claim.

### 4. Race Discrimination and Retaliation claims Against Fujitec America and Fujitec Co.

Mitchell's remaining claims are for race discrimination and related retaliation. He has alleged that Fujitec discriminated against him on the basis of race, and then retaliated against him for opposing that discrimination, under Title VII and the Ohio Civil Rights Act. The Court "consider[s] [Mr. Mitchell's] federal and state-law discrimination claims under the Title VII framework because Ohio's requirements are the same as under federal law." *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003) (citing *Ohio Civil Rights Comm'n v. Ingram*, 69 Ohio St. 3d 89, 95 (1994)). The Court turns first to Mitchell's race discrimination claim, then to his retaliation claim.

### a. Race Discrimination

Mitchell alleges he was subjected to race discrimination in the following ways: (1) he was underpaid throughout his employment and not given the pay raise he requested in 2019, Am. Compl., Doc. 19, ¶¶ 23–41, 156–57, (2) his responsibilities were reduced in 2019, *id.* ¶¶ 42–43, 156–57, (3) and Fujitec conducted a biased and incomplete investigation of McKenzie's allegations against him, leading to his termination. *Id.* ¶¶ 156–57. The Fujitec Defendants contend Mitchell has not established a prima facie race discrimination case, and even if he had, they nonetheless should prevail because the Fujitec Defendants had a legitimate, non-discriminatory reason for all actions they took with respect to Mitchell's employment, and Mitchell has not raised a genuine issue of fact as to whether those reasons were pretextual. Doc. 90, PageID 1821–31.

Where, as here, there is no direct evidence of race discrimination, the Court "appl[ies] the framework established in *McDonnell Douglas Corp. v. Green* . . . to evaluate workplace-discrimination claims." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under the *McDonnell Douglas* framework, Mitchell must first establish a prima facie case of discrimination, which requires him to show: (1) he is a member of a protected group, (2) he was subjected to "adverse employment action," (3) he was qualified for the position he held, and (4) he was treated differently than similarly-situated employees who were not members of the protected group. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999).

Mitchell, who is African American, qualifies as a member of a protected class. The Fujitec Defendants contend, however, that Mitchell has failed to establish other portions of his prima facie case under the *McDonnell Douglas* framework. As to his purported reduction in responsibility, the Fujitec Defendants argue that this event does not qualify as an "adverse action." Doc. 90, PageID 1822–23. As to his lower pay and termination, the Fujitec Defendants argue Mitchell has failed to raise a genuine issue of fact as to whether similarly-situated white employees were treated better than he was in these respects. Doc. 90, PageID 1824–26. The Court agrees that Mitchell has not established all of the elements of a prima facie case of race discrimination.

**Reduction in responsibility.** As to Mitchell's discrimination claims related to a reduction in responsibility, he does not contest the Fujitec Defendants' argument that this does not qualify as an adverse action. *See* Doc. 98, PageID 2114–15. Indeed, the reduction in responsibility alleged does not constitute "adverse action" for purposes of a Title VII claim. "An adverse employment action has been defined as a materially adverse change in the terms

and conditions of a plaintiff's employment." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (citation, quotation marks, and alteration omitted). "A bruised ego or a mere inconvenience or an alteration of job responsibilities is not sufficient to constitute an adverse employment action." *Id.* (citation and quotation marks omitted). Here, the changes in Mitchell's responsibilities—including changes in his oversight of other employees' pay—did not constitute a "significant change in employment status." *Id.* (citation omitted). They cannot form the basis of a Title VII discrimination claim.

**Pay discrimination.** Fujitec's argument regarding Mitchell's failure to identify comparators treated more favorably than him with regard to pay is a closer question. Fujitec argues that Mitchell has not identified comparators for his pay discrimination claim, because his two purported comparators, Krupp and Joe Smith, had different "job title[s], responsibilities, and/or experience." Doc. 90, PageID 1825. Mitchell acknowledges that his "specific responsibilities" were different than those of Krupp and Smith, but, says Mitchell, the Court should be "somewhat flexible in determining whether [he] has identified adequate comparators" given his unique position at Fujitec. Doc. 98, PageID 2116. Ultimately, he contends that "he and Krupp and Smith were sufficiently similar to constitute comparators for purposes of Mitchell's claims," and he also argues that Subash Patel and Joseph Rennekamp, both Fujitec Vice Presidents, are valid comparators. *Id.* at PageID 2116–17.

Under current Title VII jurisprudence, Mitchell can satisfy the fourth prong of the prima facie case requirements in one of two ways: First, Mitchell can show that "similarly situated non-protected employees were treated more favorably," or, alternatively, Mitchell can provide "other circumstantial evidence" that gives rise to an inference of discrimination. *See Boughton v. Garland*, No. 1:19-cv-154, 2022 WL 912210, *10 (S.D. Ohio Mar. 29, 2022).

23

Mitchell fails, however, to satisfy the fourth prong of the prima facie requirements using either of these methods.

Turning to the comparator question, the relevant authority supports Fujitec's contention that the other Fujitec executives identified by Mitchell are not proper comparators. "[D]ifferences in job title, responsibilities, experience, and work record" are all factors that "tend to show that two employees are not similarly situated." *Id.* (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). Each these differences in employment conditions are present here, to varying degrees.

In his Amended Complaint, Mitchell identified Krupp and Smith as comparators for purposes of his Title VII claims. Doc. 19, ¶ 27. Accordingly, the Court will assess their viability as comparators, and only briefly address Mitchell's argument regarding other individuals in leadership positions at Fujitec whom Mitchell identifies as comparators in his Response. As to Krupp, he started at Fujitec in 1996 as a district manager and worked his way up through various positions at the company. *See* Krupp Dep., Doc. 75, 19:24–20:2. In late 2018, Krupp agreed to become president of Fujitec. *Id.* at 58:4–8. All in all, as of 2019, he had thirty years of experience in the business Fujitec engaged in. *Id.* at 74:6–9. Further, as President, he had responsibility for all aspects of the company's business and was Mitchell's direct supervisor. Because of differences in Krupp and Mitchell's "job title, responsibilities, experience, and work record," *see Boughton*, 2022 WL 912210 at *10, the two were not similarly situated for purposes of Mitchell's pay discrimination claim based on racial bias.

Smith is more comparable to Mitchell in terms of experience, but his responsibilities differed significantly from Mitchell's. Smith joined Fujitec in 2011 and in 2016 became Vice President of Fujitec's New York/New Jersey region, which elevated him to Fujitec America's

leadership team. Smith Dep., Doc. 74, 7:6–8:4. However, New York/New Jersey is Fujitec's largest sales region and Smith produced good business results in that region that were important to Fujitec's overall performance. *Id.* at 15:4–16:11; 46:2–20. Given his experience in Fujitec's business operations, he represented that he served as Krupp's "right-hand man" in business operations. *Id.* at 35:19–36:6.[15] Smith also worked in the New York market where cost-of-living is higher, which Fujitec represents was also relevant to its compensation decision. Doc. 102, PageID 2190. To summarize, while Smith had a similar tenure at Fujitec to Mitchell, the record reflects that the two had significantly different responsibilities and there were other differences relevant to their compensation. Most important, Smith oversaw business operations for Fujitec's largest market and had a record of producing significant, positive business results for the company. Whether such differences in compensation on Fujitec's part were wise or prudent is not relevant to the Court's analysis. For the purposes of the prima facie case all that does matter is that Mitchell and Smith were not "similar in all of the relevant aspects." *Hatchett v. Health Care & Retirement Corp. of Am.*, 186 F.App'x 543, 548 (6th Cir. 2006) (citation, internal quotation marks and emphasis omitted).

The Court will only briefly address Mitchell's claims related to additional proposed comparators, Subash Patel and Joseph Rennekamp, both vice presidents at Fujitec. There is very little evidence in the record regarding the responsibilities and compensation of Patel and Rennekamp, likely because they were only identified as comparators in Mitchell's Response (Doc. 98). Apart from Mitchell's own declaration regarding his recollection of those employees' compensation, Doc. 93, ¶ 10, he points to no record evidence supporting his

---

[15] The two later had significant business disagreements and Smith left the company shortly after Mitchell was terminated. Smith Dep., Doc. 74, 43:10–45:6.

contention, Doc. 98, PageID 2117, that they had similar responsibilities but were paid more.[16] This evidence is simply too insubstantial for Mitchell to be able to establish a prima facie case of pay discrimination by comparing himself to Patel and Rennekamp.[17]

The allegations regarding Patel and Rennekamp are perhaps more relevant to the alternative method for establishing the fourth prong of a prima facie discrimination case: "other circumstantial evidence" that a plaintiff has been the victim of discrimination. *See Boughton*, 2022 WL 912210 at *10. In addition to his recollection that he was underpaid in comparison to other members of Fujitec's leadership team, Doc. 93, ¶ 10, Mitchell avers that as of 2019, Krupp's administrative assistant, who was white, was paid more than a National Safety Manager for Fujitec, who was African American. Doc. 19, ¶ 36. This limited circumstantial evidence does not establish Mitchell's prima facie case. As in *Boughton*, a case involving allegations of sex discrimination at the Federal Bureau of Investigation, Mitchell offers very limited evidence of discriminatory treatment of others, but his core allegation is that *he* was treated unfairly compared to co-workers who were not in his protected class. The

---

[16] In his complaint, Mitchell in fact asserted that he and Rennenkamp were paid approximately the *same amount* in 2019. Doc. 19, ¶ 29.

[17] Contrary to Mitchell's assertion, whether employees are "sufficiently similarly situated" to serve as comparators is not necessarily a fact question for a jury. *See* Doc. 98, PageID 2116. When "reasonable minds could differ" as to whether the plaintiff was treated worse than similarly situated employees, there is a jury question on that point. *See Jones v. Potter*, 488 F.3d 397, 405 (6th Cir. 2007) (citation omitted). However, here, reasonable minds could *not* differ as to whether Mitchell was similar in all relevant respects to his proposed comparators. Mitchell is thus unable to establish his prima facie case of discrimination. *See Brown v. Wormuth*, No. 3:21-cv-037, 2024 WL 3246102, *9 (W.D. Ky. June 28, 2024) ("[Plaintiff] has wholly failed to provide evidence on which a reasonable jury could find the other men were 'similarly situated' in terms of skill, effort, responsibility, and working conditions.") (citing cases reaching same conclusion on similar facts).

In support of his argument, Mitchell points to *Mitchell v. Ohio State Univ.*, No. 2:19-cv-4162, 2023 WL 6541770 (S.D. Ohio Oct. 6, 2023). But that case involved proposed comparators with very similar job titles and responsibilities to plaintiff. There, the dispute was focused on whether the plaintiff and comparators were treated similarly with respect to employer policies and discipline. This is inapposite to the instant case, where Mitchell's proposed comparators had substantially different responsibilities than he had.

proper method for evaluating such a prima facie case is assessing whether Mitchell has provided evidence that valid comparators were treated better than he was. *See Boughton*, 2022 WL 912210 at *10. And on this score, as explained above, Mitchell's prima facie case fails because he has not identified valid comparators who were paid more than him.[18]

**Termination.** The analysis with respect to Mitchell's discrimination claim arising from his termination is more straightforward. The Fujitec Defendants argue again that Mitchell has not identified any valid comparators, and note that shortly before his termination, Gibson encountered a similar situation and "resigned in lieu of termination upon the recommendation of Plaintiff." Doc. 90, PageID 1826. Mitchell responds that Gibson was treated better than him as he "was permitted to resign while Mitchell was not," and asserts that Krupp should also serve as a comparator because he was accused of sexual harassment but not disciplined. Doc. 98, PageID 2117.

The Court concludes that the comparator evidence adduced with respect to termination does not establish a prima facie case of discrimination. To establish the fourth prong of his prima facie case, Mitchell again must make a showing that he was treated unfavorably compared to similarly-situated employees. Here, Mitchell offers one valid comparator (Fujitec's former CFO Gibson), but no reasonable jury could conclude Mitchell was treated any worse than that comparator.

As to Gibson, the record evidence is clear that he met a near-identical fate to Mitchell: McKenzie accused him of sexual harassment, Fujitec undertook a very brief investigation

---

[18] While not critical to the above analysis because Mitchell identified only other members of Fujitec's leadership team as his comparators, Fujitec's other legal personnel, including Sara Conley, who took on many of Mitchell's duties following his termination, made substantially lower salaries than he did. *See* Doc. 90-1, ¶¶ 27–30. Mitchell was the highest-paid employee in the three areas of Fujitec in which he worked: Legal, Human Resources, and Safety. *Id.* ¶ 31.

(here, led by Mitchell), and the company then informed him he would not be able to continue working at the company any longer. The only manner in which Mitchell asserts that Gibson was treated more favorably is that Gibson "was permitted to resign while Mitchell was not," Doc. 98, PageID 2117. The Fujitec Defendants contend Mitchell's assertion is false and, in any case, there is no substantive difference between the terms of separation offered to Mitchell and Gibson. Doc. 102, PageID 2181. In support of their argument, the Fujitec Defendants point to a voluntary separation agreement offered to Mitchell. Doc. 101, PageID 2168. Even if Gibson were given an opportunity to resign that Mitchell was not given, the distinction would not be adequate. In Mitchell's email to Krupp advising Gibson's termination, Mitchell recommended that Gibson be informed he was "being terminated or given the opportunity to resign." Mitchell Dep. Ex. 10, Doc. 72, PageID 799. On this record, there was virtually no substantive difference between the adverse action taken against Mitchell and Gibson, as both were compelled to separate from Fujitec.[19]

Mitchell identifies no other comparator in his Response, but in a separate section of his brief contends that Krupp was accused of sexual harassment, but that accusation was dealt with more leniently than the accusations against him. Doc. 98, PageID 2118. Fujitec counters by contending that the situation involving Krupp differed, because the witnesses to his alleged harassing comment all denied that it was ever made. Doc. 102, PageID 2183. Indeed, the record indicates that the comments at issue were made in the presence of other employees, but no other employee would corroborate the claim. *See* Huesing Dep., Doc. 71, 189:16–190:3. Krupp was not similarly situated, then, as the allegation against Krupp was

---

[19] To the extent there is a difference, Gibson was conceivably treated worse, as Mitchell did not interview Gibson about McKenzie's allegations prior to recommending his termination. Doc. 90-1, ¶ 71; Doc. 98-1, ¶ 71.

controverted by other witnesses to the incident. Krupp is not a valid comparator for Mitchell's termination-based discrimination claim, as Mitchell admitted during the investigation conducted by Bulat to having a "flirtatious" relationship with McKenzie and that some of her allegations were factually accurate. Krupp Dep. Ex. W, Doc. 75, PageID 960–61.

The Court notes briefly the challenge that this factual setting poses for Mitchell's discrimination claim. He led the investigation of Gibson's conduct and handled the situation quickly, affording Gibson little opportunity to defend himself. Fundamentally, it is this rather informal and overdependent approach to examining sexual harassment claims that Mitchell objects to in Krupp's investigation of his own conduct. The problem this poses should be obvious. One cannot infer discriminatory intent on the part of Fujitec for taking a less than formal approach to investigating sexual harassment when Mitchell adopted the same approach himself, when investigating the sexual harassment claims made by Mckenzie against Gibson, Fujitec's former CFO. *See Boughton*, 2022 WL 912210 (explaining that *McDonnell Douglas* is an analytical tool used to "'sharpen[] the inquiry' with respect to the 'ultimate question': whether the plaintiff suffered invidious discrimination") (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000)).

For the foregoing reasons, Fujitec is entitled to summary judgment on Mitchell's Title VII discrimination claim. Because the Title VII analysis applies to Mitchell's Ohio-law discrimination claim, Fujitec is also entitled to summary judgment on that claim.

### b. Retaliation

Resolution of Fujitec's Motion with respect to Mitchell's retaliation claims is more straightforward. Fujitec requests summary judgment on these claims on the grounds that Mitchell never engaged in protected activity, and even if he did, there is no causal link between

that activity and his termination. Doc. 90, PageID 1832–34. Mitchell contends that his 2019 request for a raise was protected activity, and that there is a triable issue of fact on the issue of causation. Doc. 98, PageID 2115. The Court agrees that Mitchell fails to show that he engaged in protected activity.

Title VII "prohibits discriminating against any employee because that employee has engaged in conduct protected by Title VII." *Laster v. City of Kalamazoo*, 746 F.3d 714, 729 (6th Cir. 2014) (citing 42 U.S.C. § 2000e-3(a)). Under the so-called "opposition clause" of Title VII, such protected conduct includes "oppos[ing] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). *See Laster*, 746 F.3d at 729. "The opposition clause protects not only the filing of formal discrimination charges with the EEOC but also complaints to management and less formal protests of discriminatory employment practices." *Id.*

Like his discrimination claim, Mitchell seeks to prove retaliation using circumstantial evidence. Thus, the Court analyzes his retaliation claim under the *McDonnell Douglas* burden-shifting framework. *Id.* Under that framework, Mitchell must first establish a prima facie case of retaliation. If he succeeds in doing so, the burden shifts to Fujitec to articulate a "legitimate, nondiscriminatory reason for its actions." *Id.* (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). If Fujitec satisfies that burden of production, the burden shifts back to Mitchell to demonstrate that that purported reason was "not the true reason for the employment decision." *Id.*

To make out his prima facie case, Mitchell must establish the following elements: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially

30

adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Id.* (citation and internal quotation marks omitted).

The Court agrees with the Fujitec Defendants that Mitchell fails to make a prima facie case, because he has not adduced evidence that he engaged in protected activity. "For a plaintiff to demonstrate a qualifying 'protected activity,' he must show that he took an 'overt stand against suspected illegal discriminatory action.'" *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 489 (6th Cir. 2020) (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012)). As noted, this need not be a formal protest. *Laster*, 746 F.3d at 729–30. Nonetheless, a "vague charge of discrimination" does not qualify. *Khalaf*, 973 F.3d at 489 (citation omitted). *See Booker v. Brown & Williamson*, 879 F.2d 1304, 1313 (6th Cir. 1989). Nor does a complaint about working conditions that does not concern discrimination at all. *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 793–94 (S.D. Ohio Sept. 30, 1998) ("Complaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity.").

Mitchell's request for a raise falls in the latter category.  Mitchell acknowledges that in the 2019 meeting with Krupp in which he requested a raise, he did not mention race. Mitchell Dep., Doc. 72, 120:9–12. He asserts that the request for a raise nonetheless was protected under Title VII, because under the circumstances, it could only be interpreted as a complaint about race discrimination: "When Mitchell, the only black executive in the history of the company, alleged that there were discrepancies between the amount that he was paid and the amount that the non-black executives were paid, the only possible inference is that he was alleging that the pay discrepancies were discriminatory." Doc. 98, PageID 2115.

The relevant authority does not support Mitchell's contention. *See Weaver*, 71 F. Supp. 2d at 793–94. Instead, courts consistently hold that merely asking for a raise does not qualify as protected activity. *See Coleman v. Home Health Res. Inc.*, 269 F. Supp. 3d 935, 942 (D. Arizona Aug. 28, 2017) ("As a matter of law, asking for a pay raise is not protected activity."); *Herpin v. Am. Leather Operations, LLC*, No. 3:24-cv-2138, 2025 WL 963366, *4 (N.D. Tex. Mar. 31, 2025) ("([Plaintiff]'s general complaint about unfair pay, unconnected to her status as a woman, does not constitute a protected activity."); *Dwyer v. Allied Universal*, No. 3:24-cv-56, 2024 WL 3398306, *4 (N.D. W. Va. June 26, 2024) (same); *Yeger v. Inst. of Culinary Educ., Inc.*, No. 14-cv-8202, 2017 WL 377936, *15 (S.D.N.Y. Jan. 25, 2017) (same).

When Mitchell raised concerns about his pay, he did not take an "overt stand against suspected illegal discriminatory action." *Khalaf*, 973 F.3d at 489. Because Mitchell did not engage in protected activity, he has failed to establish a prima facie case of Title VII retaliation. The Fujitec Defendants are thus entitled to summary judgment on Mitchell's Title VII retaliation claim. Because the Title VII analysis applies to his Ohio-law retaliation claim, the Fujitec Defendants are entitled to summary judgment on that claim as well.[20]

### B. Defendant McKenzie's Motion for Summary Judgment (Doc. 91)

McKenzie seeks summary judgment on Mitchell's one remaining claim against her, alleging defamation. McKenzie argues she is entitled to summary judgment because her "intracompany report of sexual harassment was protected by a qualified privilege and did not cause harm." Doc. 91, PageID 1879. For purposes of her Motion, McKenzie does not contest Mitchell's assertion that her allegations were false. *Id.* ("While McKenzie adamantly

---

[20] Because Fujitec America is entitled to summary judgment on all claims against it, the Court need not address the parties' arguments regarding Fujitec Co.'s liability for its subsidiary's conduct.

maintains that her internal complaint of sexual harassment was true, for purposes of this Motion, Mitchell's denials will not be contested.").

As stated above, and in the Court's previous Order (Doc. 18), a cause of action for defamation requires five elements: "(1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." *Fisher v. Ahmed*, 2020-Ohio-1196, ¶ 32 (9th Dist.) (citation omitted). *See* Doc. 18, PageID 195.

Because McKenzie, for purposes of her Motion, surprisingly does not contest Mitchell's assertion that her allegations are false, Doc. 91, PageID 1879, the Court must consider Mitchell's allegation of falsity to be proved in its analysis. While McKenzie insists the qualified privilege still applies, her concession of falsity proves critical.

### 1. Qualified Privilege

As explained in the previous Order, there is a qualified privilege under Ohio law for communications made "in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee." *Mitchell*, 518 F. Supp. 3d at 1090–91 (quoting *Sygula v. Regency Hosp. of Cleveland East*, 2016-Ohio-2843, ¶ 22 (8th Dist.)); *see* Doc. 18. This doctrine "applies to communications made in connection with sexual harassment complaints." *Id.* (quoting *Zapata v. URS Energy & Constr., Inc.*, No. 3:13-cv-2203, 2015 WL 3953106, *7 (N.D. Ohio June 29, 2015)). The privilege, however, is "qualified, not absolute." *Id.* It can be lost in two situations. First, if the communication at issue is not made "in a reasonable manner and for a proper purpose." *Id.* at PageID 198 (quoting *Bisbee v. Cuyahoga County Bd. of Elections*, No. 77629, 2001 WL 204174, *5 (Ohio Ct.

App. 2001)). Second, "if the speaker acted with 'actual malice.'" *Id.* (quoting *Bisbee*, 2001 WL 204174 at *5). As to what qualifies as actual malice, Ohio law defines it as "acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Id.* (quoting *Zapata*, 2015 WL 3953106 at *8).

Given this backdrop, the Court held in its previous Order: "Crediting Mitchell's allegation, as the Court must at the motion-to-dismiss stage, the Court concludes, for present purposes, that McKenzie made a knowingly false statement. *That deprives her of the privilege.*" *Mitchell*, 518 F. Supp. 3d at 1093 (emphasis added); *see* Doc. 18. Because McKenzie does not contest falsity in her current brief, the Court must again credit Mitchell's allegation. And again, it "deprives her of the privilege." *Id.*

Nothing in McKenzie's brief changes this conclusion. She notes that the qualified privilege "can be defeated only by a clear and convincing showing that the communication was made with actual malice." Doc. 91, PageID 1884 (quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 11 (1995)). But she concedes, as she must, that knowledge of falsity establishes actual malice. Assuming that McKenzie's allegations were false, which, again, she concedes for purposes of the brief, Mitchell has made the requisite showing of actual malice; there is no way that McKenzie could have been unaware that the allegations were false. *See* Doc. 18, PageID 203; *Gintert v. WCI Steel, Inc.*, 2007-Ohio-6737, ¶ 27 (11th Dist.) (denying summary judgment to defendant where plaintiff contended sexual harassment allegations were false: "[S]ince [Plaintiff] has raised an issue as to whether [Defendant's] statements were made with actual malice, summary judgment could not be granted on the basis of the privilege.").

McKenzie insists that her report was made in "good faith," which she says should entitle her to a privilege against defamation, and points to a "deep-rooted public policy of encouraging employees to report sexual harassment, even if it is later determined to be unsubstantiated." Doc. 91, PageID 1883. The Court acknowledges that there is a distinction to draw between McKenzie's factual allegations and her other assertions, such that she can be liable for the former but not the latter. To the extent she made true statements about her interactions with Mitchell but mischaracterized those as sexual harassment, that would indeed be subject to a qualified privilege, as she likely would not have known the statements were false. But this logic does not apply to her factual allegations, some of which—but not all—Mitchell has flatly denied from the beginning. *See* Krupp Dep. Ex. W, Doc. 75, PageID 961 (report by Bulat documenting: "Darryl [Mitchell] said he could not remember whether he had asked Shawnez [McKenzie] if she thought he was attractive. He denied touching her in the breakroom.").[21]

To summarize, McKenzie provides no basis for the Court to revisit its previous ruling that if McKenzie's statements are false, which she admits for purposes of her Motion for Summary Judgment, they may be actionable as defamation. Doc. 18.[22]

---

[21] McKenzie relies on *Bolton v. Delta Air Lines*, 182 F. Supp. 3d 768 (S.D. Ohio Mar. 24, 2016), as a case in which the Court assumed falsity but nonetheless dismissed defamation claims. *See* Doc. 104, PageID 2209–10. In that case, however, the statements at issue were not matters of personal knowledge of the defendants, so it was possible defendants could have made them falsely without *knowing* they were false. *See Bolton*, 182 F. Supp. 3d at 772–74.

[22] McKenzie seeks summary judgment on Mitchell's defamation claim on the basis of the qualified privilege and does not propose in the alternative that the Court differentiate actionable from non-actionable statements, and grant summary judgment as to some but not others. Accordingly, the Court will not parse the allegedly defamatory statements in that way. This may be an appropriate subject for a pre-trial motion.

35

### 2.    Harm

McKenzie separately argues that Mitchell fails to raise a genuine issue of fact as to whether he was harmed by her allegedly false statements. Doc. 91, PageID 1887. She contends that the record evidence demonstrates he was terminated because he failed to respond to Gibson's harassment. *Id.*

This argument must also be rejected for reasons stated in the Court's previous opinion. "Ohio law treats false allegations of sexual harassment as defamation per se." Doc. 18, PageID 206 (citing *Shoemaker v. Community Action Org. of Scioto Cty., Inc.*, 2007-Ohio-3708, ¶ 16 (4th Dist.)). Accordingly, even if Mitchell "could show no actual damages" from McKenzie's statement, he could recover nominal damages. *Id.* at PageID 207.

Additionally, Mitchell does not "concede[] he was not harmed by the report," as McKenzie says he does. Doc. 91, PageID 1887; Doc. 94, PageID 1925–26. Instead, Mitchell has adduced evidence that McKenzie's allegations contributed to his termination. *See, e.g.,* Krupp Dep. Ex. W, Doc. 75, PageID 989 (email from Krupp recommending Mitchell's termination, stating McKenzie reported "inappropriate behavior that went over a long period of time by Darryl Mitchell" and that the behavior was "unacceptable," and only later noting allegations of non-reporting of Gibson). Mitchell has also adduced evidence that McKenzie's allegations harmed him by interfering with his ability to get another job. *See* Mitchell Dep., Doc. 72, 71:17–72:19.

Mitchell has, at a minimum, raised a genuine issue of fact as to whether he was harmed by McKenzie's allegedly false statements.

For the foregoing reasons, McKenzie's motion must be denied.

## IV.    CONCLUSION

For the reasons stated, the Court **GRANTS** the Motion for Summary Judgment filed by the Fujitec Defendants and Krupp (Doc. 90) and **DENIES** the Motion for Summary Judgment (Doc. 91) filed by McKenzie.

The Court **ORDERS** the Clerk to **TERMINATE** all Defendants from this case other than McKenzie.

**IT IS SO ORDERED.**

October 10, 2025

Jeffery P. Hopkins
United States District Judge

37